# United States Court of Appeals for the Federal Circuit

---

**ROBERT J. MACLEAN,**
*Petitioner,*

v.

**DEPARTMENT OF HOMELAND SECURITY,**
*Respondent.*

---

2011-3231

---

Petition for review of the Merit Systems Protection Board in No. SF0752060611-I-2.

---

Decided: April 26, 2013

---

LAWRENCE BERGER, Mahon & Burger, of Glen Cove, New York, argued for petitioner. Of counsel on the brief was THOMAS M. DEVINE, Government Accountability Project, of Washington, DC.

MICHAEL P. GOODMAN, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With him on the brief were STUART F. DELERY,

Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and TODD M. HUGHES, Deputy Director.

DOUGLAS HARTNETT, Elitok & Hartnett at Law, P. L.L.C., of Washington, DC, for amici curiae Elijah E. Cummings, et al.

DAVID B. NOLAN, Law Offices of David B. Nolan, Alexandria, Virginia for amicus curiae Joseph P. Carson.

―――――――――――――

Before PROST, MOORE, and WALLACH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* MOORE. Concurring opinion filed by *Circuit Judge* WALLACH.

MOORE, *Circuit Judge*.

Robert J. MacLean petitions for review of a final decision of the Merit Systems Protection Board (Board), which sustained the Transportation Security Administration's (Agency's) removal of Mr. MacLean from the position of Federal Air Marshal (Marshal). *See MacLean v. Dep't of Homeland Sec.*, 116 M.S.P.R. 562 (2011) (*MacLean II*). Because the Board incorrectly interpreted the Whistle-blower Protection Act (WPA), we *vacate* and *remand*.

## BACKGROUND

Mr. MacLean became a Marshal in 2001. In July 2003, all Marshals received a briefing from the Agency that there was a "'potential plot' to hijack U.S. Airliners." *MacLean II*, 116 M.S.P.R. at 564. Soon after that briefing, however, the Agency sent an unencrypted text message to the Marshals' cell phones cancelling all missions on flights from Las Vegas until early August. After receiving this directive, Mr. MacLean became concerned that "suspension of overnight missions during a hijacking alert created a danger to the flying public." *Id.* He complained to his supervisor and to the Office of Inspector

General, but they responded that nothing could be done. J.A. 212–13. Dissatisfied, Mr. MacLean told an MSNBC reporter about the directive so as to "create a controversy resulting in [its] rescission." *MacLean II*, 116 M.S.P.R. at 565. MSNBC published an article criticizing the directive, and the Agency withdrew it after several members of Congress joined in the criticism.

In 2004, Mr. MacLean appeared on NBC Nightly News in disguise to criticize the Agency dress code, which he believed allowed Marshals to be easily identified. However, someone from the Agency recognized his voice. During the Agency's subsequent investigation, Mr. MacLean admitted that he revealed the cancellation directive to an MSNBC reporter in 2003. Eventually, Mr. MacLean was removed from his position because his contact with the MSNBC reporter constituted an unauthorized disclosure of sensitive security information (SSI). Although the Agency had not initially labeled the text message as SSI when it was sent, it subsequently issued an order stating that its content was SSI.

Mr. MacLean challenged the SSI order in the Ninth Circuit as a violation of the Agency's own regulations and as an impermissible retroactive action, but the court rejected Mr. MacLean's challenges. *MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1150–52 (9th Cir. 2008). It held that substantial evidence supported designating the text message as SSI under the applicable regulations, *id.* at 1150, and that the Agency did not engage in retroactive action because it "applied regulations . . . in force in 2003" to determine that the text message was SSI, *id.* at 1152.

Mr. MacLean challenged his removal before the Board, arguing that his disclosure of the text message was protected whistleblowing activity. After an interlocutory appeal from the Administrative Judge (AJ), the full Board determined that Mr. MacLean's disclosure fell

outside the WPA because it was "specifically prohibited by law." 5 U.S.C. § 2302(b)(8)(A) (2008). The Board reasoned that the regulation prohibiting disclosure of SSI, upon which the Agency relied when it removed Mr. MacLean, had the force of law. *MacLean v. Dep't of Homeland Sec.*, 112 M.S.P.R. 4, 12–18 (2009) (*MacLean I*).

The AJ then upheld Mr. MacLean's removal and the Board affirmed in *MacLean II*, the decision now on appeal. Reconsidering *MacLean I*, the Board explained that a regulation is not a "law" within the meaning of the WPA. Instead, the Board held that the disclosure of the text message could not qualify for WPA protection because it was directly prohibited by a *statute*, the Aviation and Transportation Security Act (ATSA). *MacLean II*, 116 M.S.P.R. at 570–71.

The Board also determined that the AJ applied the correct regulation in upholding the Agency's removal of Mr. MacLean, and that the penalty of removal was reasonable. Moreover, the Board upheld the AJ's finding that the Agency did not terminate Mr. MacLean in retaliation for his activities on behalf of the Federal Law Enforcement Officers Association (FLEOA) because the unauthorized disclosure of SSI was a non-retaliatory reason for removal. Therefore, the Board sustained the removal.

This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

We must affirm the Board's decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (2012). We review the Board's legal

determinations *de novo.   Welshans v. U.S. Postal Serv.*, 550 F.3d 1100, 1102 (Fed. Cir. 2008).

## I. Application of Agency Regulations to Mr. MacLean's Removal

The Board explained that, "[u]nder the regulations in effect in July 2003, information relating to the deployment of [Marshals] was included within the definition of SSI," and concluded that, as a result, Mr. MacLean's communication with a reporter constituted an unauthorized disclosure. *MacLean II*, 116 M.S.P.R. at 569. Mr. MacLean argues, however, that the Board erred by upholding his removal because he was not charged under the right regulation. He explains that the regulation quoted in the initial charge, 49 C.F.R. § 1520.5(b)(8)(ii), was not in force in 2003 and only became codified in 2005. Mr. MacLean contends that the Board wrongly concluded that the regulation it ultimately relied on to uphold his removal, 49 C.F.R. § 1520.7(j), which *was* in force in 2003, is the same as the 2005 regulation. Mr. MacLean argues that the Board violated the rule of *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), because the Board affirmed his removal on grounds different from those under which he was initially charged by the deciding official.

Mr. MacLean also maintains that, although the Ninth Circuit upheld the Agency's eventual designation of the text message as SSI, his removal violated his due process rights because the message was not labeled SSI when it was sent. He argues that the termination was improper because he did not know that he was violating any Agency rules by revealing the content of the text message. Mr. MacLean admits that he signed a nondisclosure agreement as a condition of his employment, which states that Marshals "may be removed" for "[u]nauthorized release of security-sensitive or classified information." *MacLean II*, 116 M.S.P.R. at 580. He argues, however, that he believed that the message was not SSI and that, in any

event, he was protected as a whistleblower. Repeating the argument rejected by the Board, Mr. MacLean thus insists that he tried in good faith to proceed within the law.

We do not find Mr. MacLean's arguments challenging the Agency's charge to be persuasive. The regulation that the Board ultimately relied upon to uphold Mr. MacLean's removal, 49 C.F.R. § 1520.7(j) (2002), is no different from the regulation under which he was initially charged, 49 C.F.R. § 1520.5(b)(8)(ii) (2005). The earlier regulation bars disclosing "[s]pecific details of aviation security measures," including "information concerning specific numbers of [Marshals], deployments or missions," while the latter prohibits revealing "specific details of aviation . . . security measures" and "[i]nformation concerning deployments." In fact, the regulation's history shows that § 1520.5(b)(8)(ii) is simply a recodified version § 1520.7(j). *See* J.A. 36. Because the Agency removed Mr. MacLean for revealing SSI, and the Board affirmed the termination for that same reason, the Board did not violate the *Chenery* doctrine.

We likewise reject Mr. MacLean's due process and "good faith" arguments. Both the applicable regulation and the nondisclosure agreement that Mr. MacLean signed put him on notice that revealing information concerning coverage of flights by Marshals could lead to termination. Thus, the Agency did not violate due process even though it formally designated the text message as SSI only after it was sent. Furthermore, we agree with the government that, because the regulation prohibiting disclosure of SSI does not include an intent element, Mr. MacLean cannot be exonerated by his subjective belief that the content of the text message was not SSI or that he was protected as a whistleblower.

## II. Reasonableness of Mr. MacLean's Removal

Mr. MacLean argues that the Board failed to adequately analyze the factors listed in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305–06 (1981), for possible mitigation of the penalty of removal. Mr. MacLean contends that the Board did not take into account the fact that he was a one-time offender and otherwise had an unblemished record. Mr. MacLean also argues that *Douglas*'s "comparative discipline" factor did not weigh in favor of removal because other Marshals were not terminated even though they disclosed SSI regarding specific flights. Mr. MacLean contends that the Board ignored the fact that other Marshals' disclosures were for personal gain, while his disclosure exposed and led to correcting an Agency mistake. He thus argues that revealing the text message to a reporter served the public interest, and that his termination undermined the efficiency of the service.

The government counters that the Board did not abuse its discretion when it determined that Mr. MacLean's termination promoted the efficiency of the service. The government argues that there is no evidence that Mr. MacLean's actions made the flying public safer. The government contends that, because even a possibility that a Marshal may be onboard is an important deterrent to terrorist activity, Mr. MacLean's disclosure compromised flight safety and forced the Agency to reallocate scarce resources to address this new vulnerability. The government explains that, although Mr. MacLean was a first-time offender with a clean record, he was properly removed because his disclosure could have had catastrophic consequences. The government argues that Mr. MacLean differs from the Marshals who kept their jobs in spite of SSI breaches because those Marshals compromised only individual flights and showed remorse.

We agree with the government. The Board analyzed the relevant *Douglas* factors and did not abuse its discre-

tion in concluding that Mr. MacLean's removal was not a disparate penalty. *MacLean II*, 116 M.S.P.R. at 576, 580–81. Unlike other Marshals, Mr. MacLean revealed that multiple flights would be unprotected, and we cannot say that it was unreasonable for the Board to find that Mr. MacLean's belief that he was doing the right thing was outweighed by the resulting threat to public safety. Moreover, it was not unreasonable for the Board to determine that Mr. MacLean's conduct "caused the [A]gency to lose trust in him," *id.* at 579, because Mr. MacLean admitted that he has "no regrets" and "feel[s] no remorse for going to a credible and responsible media representative," *id.* at 576. Given these circumstances, the Board did not abuse its discretion by upholding Mr. MacLean's removal.

## III. Mr. MacLean's Prohibited Personnel Practice Claim

The Board rejected Mr. MacLean's argument that the Agency violated the Civil Service Reform Act by investigating him in retaliation for his FLEOA activities.[1] The statute at issue prohibits individuals in positions of authority from discriminating against a government employee "on the basis of conduct which does not adversely affect the performance of the employee . . . or the per-

---

[1] The government submitted a letter arguing that the Board lacked jurisdiction over Mr. MacLean's prohibited personnel practice claim. The government's argument is unsupported by the applicable statutes. The Board has jurisdiction to entertain prohibited personnel practice claims under 5 U.S.C. § 7701(c)(2), which states that "the agency's decision may not be sustained . . . if the employee . . . shows that the decision was based on any prohibited personnel practice described in section 2302(b) of this title." Section 7701 applies to Agency employees by virtue of 49 U.S.C. § 40122(g)(2)(H).

formance of others." 5 U.S.C. § 2302(b)(10)(A). The Board concluded that Mr. MacLean's prohibited personnel practice challenge failed because he did not "meet his burden to establish that the reason articulated by the [A]gency was pretextual and that the real reason underlying that decision was his FLEOA activities." *MacLean II*, 116 M.S.P.R. at 575. Mr. MacLean reasserts his discrimination argument on appeal. He contends that the Agency investigated him because of his 2004 appearance on NBC Nightly News, which he made as part of his advocacy on behalf of FLEOA.

We agree with the government that substantial evidence supports the Board's conclusion that the Agency did not discriminate against Mr. MacLean on the basis of his FLEOA activities. Agency Policy Directive ADM 3700 "regulate[s] and prohibit[s] [Marshals'] unauthorized contact with the media," and record evidence is consistent with the AJ's determination that Mr. MacLean was initially investigated for his unauthorized media appearance, not for his FLEOA activities. J.A. 27. Indeed, it is undisputed that the Agency began to investigate Mr. MacLean "within days of his unauthorized appearance" on NBC Nightly News, which was "approximately 22 months after he began organizing and leading the [FLEOA] chapter." J.A. 55 (quotation marks omitted). Although the Agency ultimately did not pursue the media appearance charge and focused on the SSI disclosure charge, the initial investigation does not appear to be frivolous or pretextual because it was justified by Directive ADM 3700.

## IV. Mr. MacLean's Affirmative Defense Under the WPA

The WPA prohibits individuals in positions of authority from taking a "personnel action" against a government employee in certain circumstances, particularly

> because of any disclosure of information by an employee . . . which the employee . . . reasonably

believes evidences . . . a substantial and specific danger to public health or safety, if such disclosure is *not specifically prohibited by law . . . .* [2]

5 U.S.C. § 2302(b)(8) (emphasis added).  The Board rejected Mr. MacLean's affirmative defense that his disclosure of the text message was protected whistleblowing activity because it determined that the disclosure was "specifically prohibited by law" within the meaning of the WPA.  The law that the Board relied upon is the ATSA, which states, in relevant part:

> Notwithstanding section 552 of title 5 . . . , the Secretary of Transportation *shall prescribe regulations prohibiting disclosure of information* obtained or developed in ensuring security under this title *if the Secretary of Transportation decides disclosing the information would . . . be detrimental to transportation safety*.

49 U.S.C. § 40119(b)(1) (2009) (emphases added).  Because its conclusion that revealing the content of the text message was specifically prohibited by the ATSA made further WPA inquiry unnecessary, the Board did not reach the question of whether Mr. MacLean "reasonably believe[d]" that this information "evidence[d] . . . a substantial and specific danger to public . . . safety."  5 U.S.C. § 2302(b)(8); *see MacLean II*, 116 M.S.P.R. at 581.

The parties do not dispute that, in order to fall under the WPA's "specifically prohibited by law" proviso, the disclosure must be prohibited by a statute rather than by a regulation.  Thus, the core of the disagreement is whether the ATSA "specifically prohibit[s]" disclosure of information concerning coverage of flights by Marshals within the meaning of the WPA.

---

[2]    The WPA was recently amended by the Whistleblower Protection Enhancement Act (WPEA).  Neither party argues that the WPEA applies to this appeal.

Mr. MacLean and his amici (three members of Congress) argue that the Board erroneously concluded that the ATSA's mandate to the Secretary of Transportation to "prescribe regulations prohibiting disclosure" of certain kinds of information is a specific prohibition under the WPA. They contend that the phrase "specifically prohibited by law" in the WPA can only refer to explicit statutory language that identifies specific classes of information. They argue that the ATSA's "detrimental to transportation safety" language does not establish particular criteria for withholding information and leaves a great deal of discretion to the Agency, which is inconsistent with the WPA's requirement of specificity. They contrast the ATSA with the Trade Secrets Act, which directly authorizes removal of any federal employee who divulges information that falls into particular categories. 18 U.S.C. § 1905 (2008); *see also Kent v. Gen. Servs. Admin.*, 56 M.S.P.R. 536, 540–46 (1993).

The government counters that Mr. MacLean violated a regulation promulgated pursuant to an express legislative directive in the ATSA, which made his disclosure "specifically prohibited" by a statute. It thus argues that Mr. MacLean's disclosure does not qualify for WPA protection. The government contends that Mr. MacLean's reading of the WPA eviscerates laws that provide for any Agency discretion in classifying information as SSI, and thus disables Congress from directing agencies to pass nondisclosure regulations. Lastly, the government argues that it does not make sense for Congress to order an agency to promulgate nondisclosure regulations and at the same time prohibit that agency from disciplining an employee for violating those regulations by providing a defense under the WPA.

We agree with Mr. MacLean that the ATSA does not "specifically prohibit" the disclosure at issue in this case. The ATSA's plain language does not expressly prohibit employee disclosures, and only empowers the Agency to

prescribe regulations prohibiting disclosure of SSI "*if the Secretary decides* disclosing the information would . . . be detrimental to public safety." 49 U.S.C. § 40119(b) (emphasis added). Thus, the ultimate source of prohibition of Mr. MacLean's disclosure is not a statute but a regulation, which the parties agree cannot be "law" under the WPA.

Notably, Congress changed the language "specifically prohibited by law, rule, or regulation" in the statute's draft version to simply "specifically prohibited by law." Congress did so because it was concerned that the broader language "would encourage the adoption of internal procedural regulations against disclosure, and thereby enable an agency to discourage an employee from coming forward with allegations of wrongdoing." S. Rep. No. 969, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2743. Congress explained that only "a statute which requires that matters be withheld from the public as to leave no discretion on the issue, or . . . which establishes particular criteria for withholding or refers to particular types of matters to be withheld" could qualify as a sufficiently specific prohibition. *Id.* In contrast, the "detrimental to transportation safety" language of the ATSA does not describe specific matters to be withheld. It provides only general criteria for withholding information and gives some discretion to the Agency to fashion regulations for prohibiting disclosure. Thus, the ATSA does not "specifically prohibit" employee conduct within the meaning of the WPA.

The ATSA's insufficient specificity becomes even more apparent when it is contrasted with statutes that have been determined to fall under the WPA's "specifically prohibited by law" proviso. For example, the Trade Secrets Act, which the Board in *Kent* held to qualify as a specific prohibition, is extremely detailed and comprehensive. 56 M.S.P.R. at 543–46. That statute penalizes federal employees who "divulge[ ] . . . any information

coming to [them] in the course of [their] employment . . . which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association . . . . " 18 U.S.C. § 1905. The same is true of § 6013 of the Internal Revenue Code, which the Ninth Circuit in *Coons v. Secretary of the Treasury*, 383 F.3d 879, 890–91 (9th Cir. 2003), held to fall within the meaning of the WPA's "specifically prohibited" language. That statute prohibits federal employees from "disclos[ing] any return or return information obtained by him in any manner in connection with his service," 26 U.S.C. § 6013(a)(1), and then goes on to define "return" and "return information" in explicit detail, mentioning such things as "a taxpayer's identity, the nature, source or amount of his income, payments, receipts, deductions, exemptions, credits, assets, overassessments, or tax payments . . . ," *id.* § 6013(b)(1), (2). Thus, when Congress seeks to prohibit disclosure of specific types of information, it has the ability to draft the statute accordingly.

Nonetheless, we note that the ATSA's charge to the Secretary of Transportation to prescribe regulations pursuant to specific criteria (i.e., only information that would be detrimental to transportation safety) makes this a very close case. Indeed, the ATSA appears to fall in the middle of the spectrum of statutes flanked at opposite ends by (a) those that fall squarely under the WPA's "specifically prohibited by law" proviso, such as the Trade Secrets Act and § 6013 of the Internal Revenue Code, and (b) those in which Congress delegates legislative authority to an administrative agency without circumscribing the agency's discretion. Regulations promulgated pursuant to Congress's express instructions would qualify as specific legal prohibitions. In this case, given the clarity of the statutory language and legislative intent behind the

WPA's specificity requirement, the parameters set by
Congress are not enough to push the ATSA over that
threshold.

We are similarly unpersuaded by the government's
argument that a parade of horribles necessarily follows
our adoption of Mr. MacLean's interpretation of the WPA.
The government argues that, if Mr. MacLean is allowed to
pursue his whistleblower defense, the WPA would in
effect prohibit later Congresses from directing agencies to
pass nondisclosure regulations.  The government is con-
cerned that, under Mr. MacLean's reading, the WPA
would prohibit agencies from disciplining employees for
violating nondisclosure regulations and thereby prevent
agencies from enforcing such regulations.

The government is mistaken.  In spite of the WPA,
Congress remains free to enact statutes empowering
agencies to promulgate and enforce nondisclosure regula-
tions, and it has done so in the ATSA.  The government
ignores the fact that the ATSA covers a wide range of
conduct that would not qualify as whistleblowing.  For
example, no one disputes that the ATSA empowers the
Agency to promulgate regulations that enable it to disci-
pline employees who reveal SSI for personal gain or due
to negligence, or who disclose information that the em-
ployee does not reasonably believe evidences a substantial
and specific danger to public health or safety.  The WPA
also does not prohibit the Agency from following the
ATSA's mandate to regulate public access to information
that the Agency might otherwise be forced to disclose
under the Freedom of Information Act (FOIA).  Indeed, it
appears that the paramount goal of the ATSA is to em-
power the Agency to reject the public's requests for Agen-
cy intelligence because the statute recites that,
"[n]otwithstanding [FOIA] . . . , the Secretary of Transpor-
tation shall prescribe regulations prohibiting disclosure of
information obtained or developed in ensuring security
under this title."  49 U.S.C. § 40119(b)(1); *see also Public*

*Citizen, Inc. v. FAA*, 988 F.2d 186, 194–96 (D.C. Cir. 1993) (analyzing the predecessor statute to the ATSA and explaining that Congress's desire to enable the Agency to bar FOIA requests for information that qualifies as SSI was one of the driving forces behind the passage of that statute). Our interpretation of the WPA does not deprive the ATSA of meaning.

CONCLUSION

Because Mr. MacLean's disclosure is not "specifically prohibited by law" within the meaning of the WPA, we *vacate* the Board's decision and *remand* for a determination whether Mr. MacLean's disclosure qualifies for WPA protection. For example, it remains to be determined whether Mr. MacLean reasonably believed that the content of his disclosure evidenced a substantial and specific danger to public health or safety.

**VACATED AND REMANDED**

# United States Court of Appeals for the Federal Circuit

---

**ROBERT J. MACLEAN,**
*Petitioner,*

**v.**

**DEPARTMENT OF HOMELAND SECURITY,**
*Respondent.*

---

2011-3231

---

Petition for review of the Merit Systems Protection Board in No SF0752060611-I-2.

---

WALLACH, *Circuit Judge*, concurring.

Mr. MacLean presented substantial evidence that he was not motivated by personal gain but by the desire to protect the public. He averred proof that he sought direction from his supervisors before making allegedly protected disclosures. While I join in the analysis and the result of the majority opinion, I concur to emphasize that the facts alleged, if proven, allege conduct at the core of the Whistleblower Protection Act.