(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DEPARTMENT OF HOMELAND SECURITY *v.* MACLEAN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 13–894.  Argued November 4, 2014—Decided  January 21, 2015

In 2002, Congress enacted the Homeland Security Act, 116 Stat. 2135. That Act provides that the Transportation Security Administration (TSA) "shall prescribe regulations prohibiting the disclosure of information . . . if the Under Secretary decides that disclosur[e] would . . . be detrimental to the security of transportation."  49 U. S. C. §114(r)(1)(C).  Around the same time, the TSA promulgated regulations prohibiting the unauthorized disclosure of "sensitive security information," 67 Fed. Reg. 8351, which included "[s]pecific details of aviation security measures . . . [such as] information concerning specific numbers of Federal Air Marshals, deployments or missions, and the methods involved in such operations," 49 CFR §1520.7(j).

In July 2003, the TSA briefed all federal air marshals—including Robert J. MacLean—about a potential plot to hijack passenger flights.  A few days after the briefing, MacLean received from the TSA a text message cancelling all overnight missions from Las Vegas until early August.  MacLean, who was stationed in Las Vegas, believed that cancelling those missions during a hijacking alert was dangerous and illegal.  He therefore contacted a reporter and told him about the TSA's decision to cancel the missions.  After discovering that MacLean was the source of the disclosure, the TSA fired him for disclosing sensitive security information without authorization.

MacLean challenged his firing before the Merit Systems Protection Board.  He argued that his disclosure was whistleblowing activity under 5 U. S. C. §2302(b)(8)(A), which protects employees who disclose information that reveals "any violation of any law, rule, or regulation," or "a substantial and specific danger to public health or safety."  The Board held that MacLean did not qualify for protection

Syllabus

under that statute because his disclosure was "specifically prohibited by law," §2302(b)(8)(A)—namely, by 49 U. S. C. §114(r)(1). The Court of Appeals for the Federal Circuit vacated the Board's decision, holding that Section 114(r)(1) was not a prohibition.

*Held*: MacLean's disclosure was not "specifically prohibited by law." Pp. 5–16.

    (a) The Government argues that MacLean's disclosure was "specifically prohibited by law" in two ways: first, by the TSA's regulations on sensitive security information, and second, by Section 114(r)(1) itself, which authorized the TSA to promulgate those regulations. Pp. 5–14.

      (i) MacLean's disclosure was not prohibited by the TSA's regulations for purposes of Section 2302(b)(8)(A) because regulations do not qualify as "law" under that statute. Throughout Section 2302, Congress repeatedly used the phrase "law, rule, or regulation." But Congress did not use that phrase in the statutory language at issue here; it used the word "law" standing alone. Congress's choice to say "specifically prohibited by law," instead of "specifically prohibited by law, rule, or regulation" suggests that Congress meant to exclude rules and regulations. In addition, Section 2302(b)(8)(A) creates a second exception for disclosures "required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs." That the second exception is limited to actions by the President himself suggests that the first exception does not include action taken by executive agencies. Finally, interpreting the word "law" to include rules and regulations could defeat the purpose of the whistle-blower statute. That interpretation would allow an agency to insulate itself from Section 2302(b)(8)(A) simply by promulgating a regulation that "specifically prohibited" all whistleblowing.

    The Government proposes two alternative interpretations, but neither is persuasive. First, the Government argues that the word "law" includes all regulations that have the "force and effect of law." The Government bases this argument on the decision in *Chrysler Corp.* v. *Brown*, 441 U. S. 281, where this Court held that legislative regulations generally fall within the meaning of the word "law" unless there is a "clear showing of contrary legislative intent." *Id.,* at 295–296. But Congress's use of the word "law," in close connection with the phrase "law, rule, or regulation," provides the necessary "clear showing" that "law" does not include regulations in this case. Second, the Government argues that the word "law" includes at least those regulations that were "promulgated pursuant to an express congressional directive." The Government, however, was unable to find a single example of the word "law" being used in that way. Pp. 6–11.

      (ii) Likewise, MacLean's disclosure was not prohibited by Section

Syllabus

114(r)(1). That statute does not prohibit anything; instead, it authorizes the TSA to "prescribe regulations." Thus, by its terms, Section 114(r)(1) did not prohibit the disclosure here. The Government responds that Section 114(r)(1) did prohibit MacLean's disclosure by imposing a "legislative mandate" on the TSA to promulgate regulations to that effect. But the statute affords substantial discretion to the TSA in deciding whether to prohibit any particular disclosure. Thus, it is the TSA's regulations—not the statute—that prohibited MacLean's disclosure, and those regulations do not qualify as "law" under Section 2302(b)(8)(A). Pp. 11–14.

(b) The Government argues that providing whistleblower protection to individuals like MacLean would "gravely endanger public safety" by making the confidentiality of sensitive security information depend on the idiosyncratic judgment of each of the TSA's 60,000 employees. Those concerns are legitimate, but they must be addressed by Congress or the President, rather than by this Court. Pp. 14–15.

714 F. 3d. 1301, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, THOMAS, GINSBURG, BREYER, ALITO, and KAGAN, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion, in which KENNEDY, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–894

DEPARTMENT OF HOMELAND SECURITY, PETITIONER *v.* ROBERT J. MACLEAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[January 21, 2015]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Federal law generally provides whistleblower protections to an employee who discloses information revealing "any violation of any law, rule, or regulation," or "a substantial and specific danger to public health or safety." 5 U. S. C. §2302(b)(8)(A). An exception exists, however, for disclosures that are "specifically prohibited by law." *Ibid.* Here, a federal air marshal publicly disclosed that the Transportation Security Administration (TSA) had decided to cut costs by removing air marshals from certain long-distance flights. The question presented is whether that disclosure was "specifically prohibited by law."

I

A

In 2002, Congress enacted the Homeland Security Act, 116 Stat. 2135. As relevant here, that Act provides that the TSA "shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security . . . if the Under Secretary decides that disclosing the information would . . . be detrimental to the

security of transportation." 49 U. S. C. §114(r)(1)(C).

Around the same time, the TSA promulgated regulations prohibiting the unauthorized disclosure of what it called "sensitive security information." See 67 Fed. Reg. 8351 (2002). The regulations described 18 categories of sensitive security information, including "[s]pecific details of aviation security measures . . . [such as] information concerning specific numbers of Federal Air Marshals, deployments or missions, and the methods involved in such operations." 49 CFR §1520.7(j) (2002). Sensitive security information is not classified, so the TSA can share it with individuals who do not have a security clearance, such as airport employees. Compare Exec. Order 13526, §4.1, 3 CFR 298, 314–315 (2009 Comp.), with 49 CFR §1520.11(c) (2013).

B

Robert J. MacLean became a federal air marshal for the TSA in 2001. In that role, MacLean was assigned to protect passenger flights from potential hijackings. See 49 U. S. C. §44917(a).

On July 26, 2003, the Department of Homeland Security (DHS) issued a confidential advisory about a potential hijacking plot. The advisory said that members of the terrorist group al Qaeda were planning to attack passenger flights, and that they "considered suicide hijackings and bombings as the most promising methods to destroy aircraft in flight, as well as to strike ground targets." App. 16. The advisory identified a number of potential targets, including the United Kingdom, Italy, Australia, and the east coast of the United States. Finally, the advisory warned that at least one of the attacks "could be executed by the end of the summer 2003." *Ibid.*

The TSA soon summoned all air marshals (including MacLean) for face-to-face briefings about the hijacking plot. During MacLean's briefing, a TSA official told him

that the hijackers were planning to "smuggle weapons in camera equipment or children's toys through foreign security," and then "fly into the United States . . . into an airport that didn't require them to be screened." *Id.,* at 92. The hijackers would then board U. S. flights, "overpower the crew or the Air Marshals and . . . fly the planes into East Coast targets." *Id.,* at 93.

A few days after the briefing, MacLean received from the TSA a text message cancelling all overnight missions from Las Vegas until early August. MacLean, who was stationed in Las Vegas, believed that cancelling those missions during a hijacking alert was dangerous. He also believed that the cancellations were illegal, given that federal law required the TSA to put an air marshal on every flight that "present[s] high security risks," 49 U. S. C. §44917(a)(2), and provided that "nonstop, long distance flights, such as those targeted on September 11, 2001, should be a priority," §44917(b). See App. 95, 99, 101.

MacLean therefore asked a supervisor why the TSA had canceled the missions. The supervisor responded that the TSA wanted "to save money on hotel costs because there was no more money in the budget." *Id.*, at 95. MacLean also called the DHS Inspector General's Office to report the cancellations. But a special agent in that office told him there was "nothing that could be done." *Id.,* at 97.

Unwilling to accept those responses, MacLean contacted an MSNBC reporter and told him about the canceled missions. In turn, the reporter published a story about the TSA's decision, titled "Air Marshals pulled from key flights." *Id.,* at 36. The story reported that air marshals would "no longer be covering cross-country or international flights" because the agency did not want them "to incur the expense of staying overnight in hotels." *Ibid.* The story also reported that the cancellations were "particularly disturbing to some" because they "coincide[d] with a

new high-level hijacking threat issued by the Department of Homeland Security." *Id.,* at 37.

After MSNBC published the story, several Members of Congress criticized the cancellations. Within 24 hours, the TSA reversed its decision and put air marshals back on the flights. *Id.,* at 50.

At first, the TSA did not know that MacLean was the source of the disclosure. In September 2004, however, MacLean appeared on NBC Nightly News to criticize the TSA's dress code for air marshals, which he believed made them too easy to identify. Although MacLean appeared in disguise, several co-workers recognized his voice, and the TSA began investigating the appearance. During that investigation, MacLean admitted that he had disclosed the text message back in 2003. Consequently, in April 2006, the TSA fired MacLean for disclosing sensitive security information without authorization.

MacLean challenged his firing before the Merit Systems Protection Board, arguing in relevant part that his disclosure was protected whistleblowing activity under 5 U. S. C. §2302(b)(8)(A). The Board held that MacLean did not qualify for protection under that statute, however, because his disclosure was "specifically prohibited by law." 116 MSPR 562, 569–572 (2011).

The Court of Appeals for the Federal Circuit vacated the Board's decision. 714 F. 3d 1301 (2013). The parties had agreed that, in order for MacLean's disclosure to be "specifically prohibited *by law*," it must have been "prohibited by a statute rather than by a regulation." *Id.,* at 1308 (emphasis added). Thus, the issue before the court was whether the statute authorizing the TSA's regulations— now codified at 49 U. S. C. §114(r)(1)—"specifically prohibited" MacLean's disclosure. 714 F. 3d, at 1308.*

───────────

*This statute has a complicated history. It was codified at 49 U. S. C. §40119(b)(1) when the TSA initially promulgated its regulations on

The court first held that Section 114(r)(1) was not a prohibition. The statute did "not expressly prohibit employee disclosures," the court explained, but instead empowered the TSA to "prescribe regulations prohibiting disclosure[s]" if the TSA decided that disclosing the information would harm public safety. *Id.,* at 1309. The court therefore concluded that MacLean's disclosure was prohibited by a regulation, which the parties had agreed could not be a "law" under Section 2302(b)(8)(A). *Ibid.*

The court then held that, even if Section 114(r)(1) were a prohibition, it was not "sufficiently specific." *Ibid.* The court explained that a law is sufficiently specific only if it "requires that matters be withheld from the public as to leave no discretion on the issue, or . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." *Ibid.* (quoting S. Rep. No. 95–969 (1978)). And Section 114(r)(1) did not meet that test because it "provide[d] only general criteria for withholding information and [gave] some discretion to the [TSA] to fashion regulations for prohibiting disclosure." 714 F. 3d, at 1309. The court accordingly vacated the Board's decision and remanded for a determination of whether MacLean's disclosure met the other requirements under Section 2302(b)(8)(A). *Id.,* at 1310–1311.

We granted certiorari. 572 U. S. ___ (2014).

## II

Section 2302(b)(8) provides, in relevant part, that a federal agency may not take

> "a personnel action with respect to any employee or applicant for employment because of

–––––––––

sensitive security information. It was codified at §114(s)(1) when MacLean disclosed the text message to MSNBC. And it is now codified at §114(r)(1). The Federal Circuit referred to §40119(b)(1) in its opinion. Because the statute has remained identical in all relevant respects, however, we and the parties refer to the current version.

"(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences

"(i) any violation of any law, rule, or regulation, or

"(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,

"if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs."

The Government argues that this whistleblower statute does not protect MacLean because his disclosure regarding the canceled missions was "specifically prohibited by law" in two ways. First, the Government argues that the disclosure was specifically prohibited by the TSA's regulations on sensitive security information: 49 CFR §§1520.5(a)–(b), 1520.7(j) (2003). Second, the Government argues that the disclosure was specifically prohibited by 49 U. S. C. §114(r)(1), which authorized the TSA to promulgate those regulations. We address each argument in turn.

## A
### 1

In 2003, the TSA's regulations prohibited the disclosure of "[s]pecific details of aviation security measures . . . [such as] information concerning specific numbers of Federal Air Marshals, deployments or missions, and the methods involved in such operations." 49 CFR §1520.7(j). MacLean does not dispute before this Court that the TSA's regulations prohibited his disclosure regarding the canceled missions. Thus, the question here is whether a disclosure that is specifically prohibited by regulation is also "specifically prohibited *by law*" under Section 2302(b)(8)(A). (Emphasis added.)

The answer is no. Throughout Section 2302, Congress repeatedly used the phrase "law, rule, or regulation." For example, Section 2302(b)(1)(E) prohibits a federal agency from discriminating against an employee "on the basis of marital status or political affiliation, as prohibited under any law, rule, or regulation." For another example, Section 2302(b)(6) prohibits an agency from "grant[ing] any preference or advantage not authorized by law, rule, or regulation." And for a third example, Section 2302(b)(9)(A) prohibits an agency from retaliating against an employee for "the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation."

In contrast, Congress did not use the phrase "law, rule, or regulation" in the statutory language at issue here; it used the word "law" standing alone. That is significant because Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another. *Russello* v. *United States*, 464 U. S. 16, 23 (1983). Thus, Congress's choice to say "specifically prohibited by law" rather than "specifically prohibited by law, rule, or regulation" suggests that Congress meant to exclude rules and regulations.

The interpretive canon that Congress acts intentionally when it omits language included elsewhere applies with particular force here for two reasons. First, Congress used "law" and "law, rule, or regulation" in close proximity—indeed, in the same sentence. §2302(b)(8)(A) (protecting the disclosure of "any violation of any law, rule, or regulation . . . if such disclosure is not specifically prohibited by law"). Second, Congress used the broader phrase "law, rule, or regulation" repeatedly—nine times in Section 2302 alone. See §§2302(a)(2)(D)(i), (b)(1)(E), (b)(6), (b)(8)(A)(i), (b)(8)(B)(i), (b)(9)(A), (b)(12), (b)(13), (d)(5). Those two aspects of the whistleblower statute make Congress's choice to use the narrower word "law" seem quite deliberate.

Opinion of the Court

We drew the same inference in *Department of Treasury, IRS* v. *FLRA*, 494 U. S. 922 (1990). There, the Government argued that the word "laws" in one section of the Civil Service Reform Act of 1978 meant the same thing as the phrase "law, rule, or regulation" in another section of the Act. *Id.*, at 931. We rejected that argument as "simply contrary to any reasonable interpretation of the text." *Id.*, at 932. Indeed, we held that a statute that referred to "laws" in one section and "law, rule, or regulation" in another "cannot, unless we abandon all pretense at precise communication, be deemed to mean the same thing in both places." *Ibid.* That inference is even more compelling here, because the statute refers to "law" and "law, rule, or regulation" in the same sentence, rather than several sections apart.

Another part of the statutory text points the same way. After creating an exception for disclosures "specifically prohibited by law," Section 2302(b)(8)(A) goes on to create a second exception for information "specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs." This exception is limited to action taken directly by the President. That suggests that the word "law" in the only other exception is limited to actions by Congress—after all, it would be unusual for the first exception to include action taken by executive agencies, when the second exception requires action by the President himself.

In addition, a broad interpretation of the word "law" could defeat the purpose of the whistleblower statute. If "law" included agency rules and regulations, then an agency could insulate itself from the scope of Section 2302(b)(8)(A) merely by promulgating a regulation that "specifically prohibited" whistleblowing. But Congress passed the whistleblower statute precisely because it did not trust agencies to regulate whistleblowers within their ranks. Thus, it is unlikely that Congress meant to include

rules and regulations within the word "law."

## 2

The Government admits that some regulations fall outside the word "law" as used in Section 2302(b)(8)(A). But, the Government says, that does not mean that *all* regulations are excluded. The Government suggests two interpretations that would distinguish "law" from "law, rule, or regulation," but would still allow the word "law" to subsume the TSA's regulations on sensitive security information.

First, the Government argues that the word "law" includes all regulations that have the "force and effect of law" (*i.e.*, legislative regulations), while excluding those that do not (*e.g.*, interpretive rules). Brief for Petitioner 19–22. The Government bases this argument on our decision in *Chrysler Corp.* v. *Brown*, 441 U. S. 281 (1979). There, we held that legislative regulations generally fall within the meaning of the word "law," and that it would take a "clear showing of contrary legislative intent" before we concluded otherwise. *Id.*, at 295–296. Thus, because the TSA's regulations have the force and effect of law, the Government says that they should qualify as "law" under the statute.

The Government's description of *Chrysler* is accurate enough. But Congress's use of the word "law," in close connection with the phrase "law, rule, or regulation," provides the necessary "clear showing" that "law" does not include regulations. Indeed, using "law" and "law, rule, or regulation" in the same sentence would be a very obscure way of drawing the Government's nuanced distinction between different types of regulations. Had Congress wanted to draw that distinction, there were far easier and clearer ways to do so. For example, at the time Congress passed Section 2302(b)(8)(A), another federal statute defined the words "regulatory order" to include a "rule or

regulation, if it has the force and effect of law." 7 U. S. C. §450c(a) (1976 ed.). Likewise, another federal statute defined the words "State law" to include "all laws, decisions, rules, regulations, or other State action having the effect of law." 29 U. S. C. §1144(c)(1) (1976 ed.). As those examples show, Congress knew how to distinguish between regulations that had the force and effect of law and those that did not, but chose not to do so in Section 2302(b)(8)(A).

Second, the Government argues that the word "law" includes at least those regulations that were "promulgated pursuant to an express congressional directive." Brief for Petitioner 21. Outside of this case, however, the Government was unable to find a single example of the word "law" being used in that way. Not a single dictionary definition, not a single statute, not a single case. The Government's interpretation happens to fit this case precisely, but it needs more than that to recommend it.

Although the Government argues here that the word "law" includes rules and regulations, it definitively rejected that argument in the Court of Appeals. For example, the Government's brief accepted that the word "law" meant "legislative enactment," and said that the "only dispute" was whether 49 U. S. C. §114(r)(1) "serve[d] as that legislative enactment." Brief for Respondent in No. 11–3231 (CA Fed.), pp. 46–47. Then, at oral argument, a judge asked the Government's attorney the following question: "I thought I understood your brief to concede that [the word "law"] can't be a rule or regulation, it means statute. Am I wrong?" The Government's attorney responded: "You're not wrong your honor. I'll be as clear as I can. 'Specifically prohibited by law' here means statute." Oral Arg. Audio in No. 11–3231, at 22:42–23:03; see also *id.*, at 29:57–30:03 ("Now, as we've been discussing here, we're not saying here that [the word "law"] needs to encompass regulations. We're saying statute."). Those

concessions reinforce our conclusion that the Government's proposed interpretations are unpersuasive.

In sum, when Congress used the phrase "specifically prohibited by law" instead of "specifically prohibited by law, rule, or regulation," it meant to exclude rules and regulations. We therefore hold that the TSA's regulations do not qualify as "law" for purposes of Section 2302(b)(8)(A).

## B

We next consider whether MacLean's disclosure regarding the canceled missions was "specifically prohibited" by 49 U. S. C. §114(r)(1) itself. As relevant here, that statute provides that the TSA "shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security . . . if the Under Secretary decides that disclosing the information would . . . be detrimental to the security of transportation." §114(r)(1)(C).

This statute does not prohibit anything. On the contrary, it *authorizes* something—it authorizes the Under Secretary to "prescribe regulations." Thus, by its terms Section 114(r)(1) did not prohibit the disclosure at issue here.

The Government responds that Section 114(r)(1) did prohibit MacLean's disclosure by imposing a "legislative mandate" on the TSA to promulgate regulations to that effect. See Brief for Petitioner 28, 33; see also *post*, at 2–3 (SOTOMAYOR, J., dissenting). But the Government pushes the statute too far. Section 114(r)(1) says that the TSA shall prohibit disclosures only "*if the Under Secretary decides* that disclosing the information would . . . be detrimental to the security of transportation." §114(r)(1)(C) (emphasis added). That language affords substantial discretion to the TSA in deciding whether to prohibit any particular disclosure.

The dissent tries to downplay the scope of that discre-

tion, viewing it as the almost ministerial task of "*identifying* whether a particular piece of information falls within the scope of Congress' command." *Post*, at 3. But determining which documents meet the statutory standard of "detrimental to the security of transportation" requires the exercise of considerable judgment. For example, the Government says that Section 114(r)(1) requires the Under Secretary to prohibit disclosures like MacLean's. The Government also says, however, that the statute does not require the Under Secretary to prohibit an employee from disclosing that "federal air marshals will be absent from important flights, but declining to specify which flights." Reply Brief 23. That fine-grained distinction comes not from Section 114(r)(1) itself, but from the Under Secretary's exercise of discretion. It is the TSA's regulations— not the statute—that prohibited MacLean's disclosure. And as the dissent agrees, a regulation does not count as "law" under the whistleblower statute. See *post*, at 1.

The Government insists, however, that this grant of discretion does not make Section 114(r)(1) any less of a prohibition. In support, the Government relies on *Administrator, FAA* v. *Robertson*, 422 U. S. 255 (1975). That case involved the Freedom of Information Act (FOIA), which requires federal agencies to disclose information upon request unless, among other things, the information is "specifically exempted from disclosure by statute." 5 U. S. C. §552(b)(3). In *Robertson*, we held that the Federal Aviation Act of 1958 was one such statute, because it gave the Federal Aviation Administration (FAA) "a broad degree of discretion" in deciding whether to disclose or withhold information. 422 U. S., at 266.

The Government tries to analogize that case to this one. In *Robertson*, the Government says, the FAA's discretion whether to disclose information did not preclude a finding that the information was "specifically exempted" from disclosure by statute. So too here, the Government says,

the TSA's discretion whether to prohibit disclosure of information does not preclude a finding that the information is "specifically prohibited" from disclosure by Section 114(r)(1). See Brief for Petitioner 30.

This analogy fails. FOIA and Section 2302(b)(8)(A) differ in an important way: The provision of FOIA at issue involves information that is "*exempted*" from disclosure, while Section 2302(b)(8)(A) involves information that is "*prohibited*" from disclosure.

A statute that exempts information from mandatory disclosure may nonetheless give the agency discretion to release that exempt information to the public. In such a case, the agency's exercise of discretion has no effect on whether the information is "exempted from disclosure *by statute*"—it remains exempt whatever the agency chooses to do.

The situation is different when it comes to a statute giving an agency discretion to prohibit the disclosure of information. The information is not prohibited from disclosure *by statute* regardless of what the agency does. It is the agency's exercise of discretion that determines whether there is a prohibition at all. Thus, when Section 114(r)(1) gave the TSA the discretion to prohibit the disclosure of information, the statute did not create a prohibition—it gave the TSA the power to create one. And because Section 114(r)(1) did not create a prohibition, MacLean's disclosure was not "prohibited *by law*" under Section 2302(b)(8)(A), but only by a regulation issued in the TSA's discretion.

In any event, *Robertson* was a case about FOIA, not Section 2302, and our analysis there depended on two FOIA-specific factors that are not present here. First, we examined the legislative history of FOIA and determined that Congress did not intend that statute to affect laws like the Federal Aviation Act. 422 U. S., at 263–265. In particular, we noted that the Civil Aeronautics Board had

expressed its view during congressional hearings that the Federal Aviation Act qualified as an exempting statute under FOIA, and that "no question was raised or challenge made" to the agency's view. *Id.,* at 264–265. But that legislative history can have no effect on our analysis of Section 2302(b)(8)(A).

Second, we said that the Federal Aviation Act could fail to qualify as an exempting statute only if we read FOIA "as repealing by implication all existing statutes which restrict public access to specific Government records." *Id.,* at 265 (internal quotation marks omitted). Then, relying on the presumption that "repeals by implication are disfavored," we rejected that interpretation of FOIA. But the presumption against implied repeals has no relevance here. Saying that Section 114(r)(1) is not a prohibition under the whistleblower statute is not the same as saying that the whistleblower statute implicitly repealed Section 114(r)(1). On the contrary, Section 114(r)(1) remains in force by allowing the TSA to deny FOIA requests and prohibit employee disclosures that do not qualify for whistleblower protection under Section 2302(b)(8)(A).

Ultimately, FOIA and Section 2302(b)(8)(A) are different statutes—they have different language, different histories, and were enacted in different contexts. Our interpretation of one, therefore, has no impact whatsoever on our interpretation of the other.

## III

Finally, the Government warns that providing whistleblower protection to individuals like MacLean would "gravely endanger public safety." Brief for Petitioner 38. That protection, the Government argues, would make the confidentiality of sensitive security information depend on the idiosyncratic judgment of each of the TSA's 60,000 employees. *Id.*, at 37. And those employees will "most likely lack access to all of the information that led the TSA

to make particular security decisions." *Id.*, at 38. Thus, the Government says, we should conclude that Congress did not intend for Section 2302(b)(8)(A) to cover disclosures like MacLean's.

Those concerns are legitimate. But they are concerns that must be addressed by Congress or the President, rather than by this Court. Congress could, for example, amend Section 114(r)(1) so that the TSA's prohibitions on disclosure override the whistleblower protections in Section 2302(b)(8)(A)—just as those prohibitions currently override FOIA. See §114(r)(1) (authorizing the TSA to prohibit disclosures "[n]otwithstanding section 552 of title 5"); see also 10 U. S. C. §2640(h) ("the Secretary of Defense may (notwithstanding any other provision of law) withhold from public disclosure safety-related information that is provided to the Secretary voluntarily by an air carrier for the purposes of this section"). Congress could also exempt the TSA from the requirements of Section 2302(b)(8)(A) entirely, as Congress has already done for the Federal Bureau of Investigation, the Central Intelligence Agency, the Defense Intelligence Agency, the National Geospatial-Intelligence Agency, the National Security Agency, the Office of the Director of National Intelligence, and the National Reconnaissance Office. See 5 U. S. C. §2302(a)(2)(C)(ii)(I).

Likewise, the President could prohibit the disclosure of sensitive security information by Executive order. Indeed, the Government suggested at oral argument that the President could "entirely duplicate" the regulations that the TSA has issued under Section 114(r)(1). Tr. of Oral Arg. 16–20. Such an action would undoubtedly create an exception to the whistleblower protections found in Section 2302(b)(8)(A).

Although Congress and the President each has the power to address the Government's concerns, neither has done so. It is not our role to do so for them.

The judgment of the United States Court of Appeals for the Federal Circuit is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

---

No. 13–894

---

## DEPARTMENT OF HOMELAND SECURITY, PETITIONER *v.* ROBERT J. MACLEAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[January 21, 2015]

JUSTICE SOTOMAYOR, with whom JUSTICE KENNEDY joins, dissenting.

I agree with much of the Court's opinion. I have no qualms with the Court's conclusion that the phrase "specifically prohibited by law," as used in the Whistleblower Protection Act of 1989 (WPA), 5 U. S. C. §2302(b)(8)(A), does not encompass disclosures prohibited only by regulation. See *ante*, at 7. Nor do I see any problem in the distinction the Court draws between statutes that *prohibit* information from being disclosed, the violation of which may preclude application of the WPA, and statutes that simply *exempt* information from otherwise-applicable disclosure requirements, which do not trigger the WPA's "prohibited by law" exception. See *ante*, at 12–13.

I part ways with the Court, however, when it concludes that 49 U. S. C. §114(r)(1) does not itself prohibit the type of disclosure at issue here—the release of information regarding the absence of federal air marshals on overnight flights. *Ante*, at 11. That statute provides, in relevant part, that the Transportation Security Administration (TSA) "*shall* prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security . . . if the Under Secretary decides that disclosing the information would . . . be detrimental to the security of transportation." §114(r)(1) (emphasis added).

The Court reasons, first, that Section 114(r)(1) does not "prohibit anything," but instead simply "*authorizes*" the TSA to prescribe regulations. *Ante*, at 11. But this contention overlooks the statute's use of the word "shall," which, as we have observed, "generally means 'must.'" *Gutierrez de Martinez* v. *Lamagno*, 515 U. S. 417, 432, n. 9 (1995); see also, *e.g.*, *Federal. Express Corp.* v. *Holowecki*, 552 U. S. 389, 400 (2008) ("Congress' use of the term 'shall' indicates an intent to 'impose discretionless obligations'") (some internal quotation marks omitted)); A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 114 (2012) ("[W]hen the word *shall* can reasonably read as mandatory, it ought to be so read"). Section 114(r)(1) does not merely *authorize* the TSA to promulgate regulations; it directs it to do so, and describes what those regulations must accomplish.

The Court focuses, second, on the fact that Section 114(r) authorizes the TSA to "'decid[e]'" whether the disclosure of a particular item of information would in fact be "'detrimental to the security of transportation.'" *Ante*, at 11–12 (emphasis deleted). I certainly agree that this language vests some discretion in the agency.[1] But the

―――――――――

[1] The Court does not address respondent's alternative argument, accepted by the Court of Appeals below, that Section 114(r)(1) describes the information encompassed in its prohibitory scope with insufficient particularity to qualify the disclosure here as "*specifically* prohibited by law" within the meaning of the WPA. Some of the legislative history of the WPA linked its specificity requirement to the criteria established in Exemption 3 of the Freedom of Information Act, 5 U. S. C. §552(b)(3), and the Court of Appeals applied this standard. See 714 F. 3d 1301, 1309 (CA Fed. 2013); see also S. Rep. No. 95–969, pp. 21–22 (1978). MacLean has offered no argument that a WPA anti-disclosure statute must define the relevant category of information with any greater degree of particularity. Assuming the Exemption 3 standard is applicable, I note that Section 114(r) is at least as "specific" as the statutory provisions we have previously held to satisfy Exemption 3's requirements. See, *e.g.*, *Department of Justice* v. *Julian*, 486 U. S. 1, 9 (1988) (holding that provisions of Federal Rule of Criminal Procedure

agency is required to prevent the disclosure of any information it determines is within Congress' prohibition; its discretion pertains only to *identifying* whether a particular piece of information falls within the scope of Congress' command. In concluding that such residual agency discretion deprives Section 114(r) of prohibitory effect, the Court overlooks the degree of agency involvement that is necessary in the administration of many antidisclosure statutes. Congress cannot be expected to identify with particularity each individual document or datum the release of which it wants to preclude. Often, it will have to leave to an agency or other enforcing authority the tasks of defining—perhaps through regulations—exactly what type of information falls within the scope of the congressional prohibition, and of determining whether a particular item of information fits the bill. The enforcing authority may, as the Court puts it, sometimes be required to make some "fine-grained distinction[s]" in fulfilling this charge, *ante*, at 12, but that does not change the fact that Congress itself is the source of the prohibition on disclosure.[2]

Indeed, Congress appears to have anticipated the need for agency involvement in the interpretation and enforce-

—————

32(c)(3)(A) and former 18 U. S. C. §4208(c)(1982 ed.) prohibiting disclosure of portions of presentence reports "relat[ed] to confidential sources, diagnostic opinions, *and other information that may cause harm to the defendant or to third parties*" could justify withholding under Exemption 3 (emphasis added)).

[2] For the same reasons, the agency's decision that a disclosure contravened a statute may not necessarily be determinative in any given WPA case: Although an agency may no doubt receive deference in the interpretation and implementation of a prohibitory statute, ultimately WPA protection will not apply if the agency improperly concluded that a given disclosure was prohibited by that statute. Cf. *CIA* v. *Sims*, 471 U. S. 159, 168–181 (1985) (according deference to Central Intelligence Agency's expertise, but engaging in an extended analysis of whether the particular information the agency refused to disclose fell within the scope of the statutory prohibition).

ment of antidisclosure statutes at the time it enacted the WPA. The Senate Report to the WPA identified only two statutes the violation of which would preclude whistle-blower protection, the first being Section 102(d)(3) of the National Security Act of 1947, 61 Stat. 498, which provided that "the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure." See S. Rep. No. 95–969, pp. 21–22 (1978). This example clearly suggests Congress contemplated that a statute directing an agency to protect against disclosures and delegating substantial authority to the agency should nevertheless be deemed to impose the relevant prohibition. Section 114(r)(1)'s delegation to the TSA to "decide" whether the release of particular information would be "detrimental to the security of transportation" likewise simply reflects Congress' recognition of the inevitable fact that the agency will be tasked, in the first instance, with enforcing its statutory mandate.

In sum, with Section 114(r)(1), Congress has required agency action that would preclude the release of information "detrimental to the security of transportation." In so doing, Congress has expressed its clear intent to prohibit such disclosures. I would respect its intent, and hold that a disclosure contravening that mandate is "prohibited by law" within the meaning of the WPA.

Having said all that, I appreciate the narrowness of the Court's holding. The Court's conclusion that Section 114(r) does not itself prohibit any disclosures depends entirely on the statutory language directing the agency to "prescribe regulations," and providing that the agency will "decid[e]" what information falls within the statue's purview. See *ante*, at 11. From all that appears in the majority opinion, then, this case would likely have turned out differently if Section 114(r) instead provided: "The disclosure of information detrimental to the security of transportation is prohibited, and the TSA shall promulgate

regulations to that effect," or "The Under Secretary shall prescribe regulations prohibiting the disclosure of information detrimental to the security of transportation; and such disclosures are prohibited." I myself decline to surrender so fully to sheer formalism, especially where transportation security is at issue and there is little dispute that the disclosure of air marshals' locations is potentially dangerous and was proscribed by the relevant implementing regulation. In so surrendering, however, the Court would appear to have enabled future courts and Congresses to avoid easily the consequences of its ruling, and thus to have limited much of the potential for adverse practical effects beyond this case. But in the interim, at least, the Court has left important decisions regarding the disclosure of critical information completely to the whims of individual employees.

I respectfully dissent.