MARTIN, Circuit Judge,
dissenting, in which WILSON and JILL PRYOR, Circuit Judges, join, and JORDAN and ROSENBAUM, Circuit Judges, join as to Part II:
The Supreme Court told us in Smith v. City of Jackson, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005), that people who have been discriminated against because of their age can rely on the Age Discrimination in Employment Act of 1967 (ADEA) to bring disparate impact claims. A disparate impact claim asserts that an employer engages in practices that may look neutral on their face, but in fact treat one group more harshly than another. Int’l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15 (1977). Today’s decision by the majority makes ours the first court of appeals to hold that Smith does not allow for disparate impact claims by people alleging discrimination in hiring. To get to this result, the majority ignores the plain text of the ADEA; rejects the interpretation that the governing agencies have used since 1968; and misreads the Supreme Court’s landmark decision in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Specifically, the majority says Griggs had nothing to do with discrimination in hiring. But to the contrary, Griggs did create disparate impact liability for discriminatory “hiring criteria.” Texas Dep’t of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. -, 135 S.Ct. 2507, 2517, 192 L.Ed.2d 514 (2015). The text of the ADEA that we interpret here is identical to the text the Supreme Court interpreted in Griggs. This is just one of many reasons why this court should have reached the same result as the Supreme Court did in Griggs, and allowed Richard Villarreal’s disparate impact claim against R.J. Reynolds Tobacco Company (RJ Reynolds) to proceed.
Griggs isn’t the only seminal civil rights case the majority misreads. The majority also says that Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924 (5th Cir. 1975), did not do what everyone has always said it did. Mr. Villarreal says he couldn’t know that 'RJ Reynolds "broke the law because the company did so in secret. For over forty years, this court has equitably tolled the limitations period for filing suit on discrimination claims “until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent pegard for his rights.” Id. at 930. The reason for this rule is simple: “Secret preferences in hiring and even more subtle means of illegal discrimination, because of their very nature, are unlikely to be readily apparent to the individual discriminated against.” Id. at 931. The majority now tells us that secret discrimination won’t be punished unless the victim tried to expose the discrimination himself, even if he had no reason to suspect anyone was discriminating against him. This is contrary to our precedent. Our court has traditionally required victims of discrimination to act with reasonable diligence. Now, the majority requires victims to act with diligence beyond what reason would suggest.
Both of the majority’s holdings in this case do harm to this court’s precedent and to the nation’s anti-discrimination laws. I respectfully dissent.
I.
Section 4(a)(2) of the ADEA says an employer may not
*982 limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.
29 U.S.C. § 623(a)(2). This plainly describes what RJ Reynolds did to Mr. Villarreal. Specifically, Mr. Villarreal is an “individual” who was “deprive[d]” “of employment opportunities” and denied any “status as an employee” because of something an employer did to “limit ... his employees.” To use a simple example, suppose a restaurant owner says he will pay college students more than he pays other employees. Smith said this kind of wage differentiation could violate the ADEA. Now suppose the same employer says he won’t even hire someone who is not a college student. This is plainly a decision to “limit ... his employees” to college students. And college students tend to be young, so this limit may “tend to deprive an[] individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s age.” More to the point, an older “individual” could find himself “deprive[d] ... of employment opportunities” or denied any “status as an employee, because of such individual’s age.” The plain text of the statute covers a claim like this. And this perfectly natural reading is the one the EEOC has always used.
The majority says: no, when Congress wrote “to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities” what it really meant (and said without ambiguity) was “to limit, segregate, or classify his employees in any way which would deprive or tend to deprive [those] individuals] of employment opportunities.” The majority says the only reasonable reading of § 4(a)(2) is that the earlier reference to “his employees” (which describes who an employer can’t “limit, segregate, or classify”) must be assumed to impliedly narrow the plainly broader reference to “any individual” (which describes who can’t be deprived of employment opportunities based on the employer’s actions).
That’s not what the statute says. Congress said age discrimination must not “deprive any individual of employment opportunities.” If Congress intended to protect a narrower group, it would have said so. For example, the same sentence of § 4(a)(2) later uses the term “such individuals” to refer back to a set of people who were introduced earlier. And a different part of the sentence uses the word “employees,” when referring to the people an employer can’t “limit, segregate, or classify.” But when the statute described the group who would be protected by this prohibition imposed on employers, Congress chose the term “any individual.” “This deliberate variation in terminology within the same sentence of a statute suggests that Congress did not interpret the two terms as being equivalent.” United States v. Williams, 340 F.3d 1231, 1236 (11th Cir. 2003). The rest of § 4(a)(2) shows that Congress knew how to use narrower terms, but it chose to say “any individual” when referring to who can be injured by an employer’s discrimination. We can’t ignore that choice. To the contrary, “[t]he interpretive canon that Congress acts intentionally when it omits language included elsewhere applies with particular force” here, because Congress used the same language “in close proximity—indeed, in the same sentence.” Dep’t of Homeland Sec. v. MacLean, — U.S. -, -, 135 S.Ct. 913, 919, 190 L.Ed.2d 771 (2015).
Saying the term “any individual”-really means “employees” isn’t the only way that *983 the majority rewrites § 4(a)(2). The majority also says the phrase “deprive any individual of employment opportunities” can’t mean refusing to hire someone. The majority’s position here is that these clear words (again, “deprive any individual of employment opportunities”) are impliedly limited by the later phrase “or otherwise adversely affect his status as an employee” in such a way that a person can never be “deprived of an employment opportunity” unless he also loses a current “status as an employee.” Maj. Op. at 964. There are at least two problems with this. First, the majority reads “deprive any individual of employment opportunities” out of the statute. This violates the principle that “every word [in a statute] is to be given effect.” Antonin Scalia & Bryan A. Garner, Reading Law 174 (2012).
Second, even if we do take those words out of the statute, § 4(a)(2) still applies to Mr. Villarreal’s case through the statute’s “adversely affect his status as an employee” language. Certainly it is true that Mr. Villarreal was denied any “status as an employee.” Yet the majority says “affect his status as an employee” can’t refer to a job that someone wanted but didn’t get because, according to the majority, “[dictionaries confirm that the phrase ‘status as an employee’ connotes a present fact.” Maj. Op. at 964. This resort to abstract definitions is puzzling. Dictionaries say what a word means. They are far less useful for figuring out what tense a word “connotes,” since the same word can connote different tenses in different contexts. And before using dictionaries to “confirm” the tense of a word in a statute, I would go to the Dictionary Act, which says that “unless the context indicates otherwise ... words used in the present tense include the future as well as the present.” 1 U.S.C. § l.[1]
Also, the majority’s statement that the phrase “status as an employee” always “connotes a present fact” is just plain wrong. Title VII also uses the words “deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee.” 42 U.S.C. § 2000e-2(a)(2) (emphasis added). And in Title VII, those exact same words prohibit hiring discrimination. Even so, the majority says it’s impossible for the identical words to do the same job in the ADEA. Also, Title VII isn’t the only place where the word “status” is used to describe a status someone wanted but didn’t get. “Status” is used this way all the time. For example, a disability claimant can be “denied her status as disabled.” Joseph v. Chater, 84 F.3d 433, 433 (5th Cir. 1996) (per curiam). Or an alien can be “denied status as a permanent resident.” Santos v. Immigration & Naturalization Serv., 375 F.2d 262, 264 n.1 (9th Cir. 1967).[2] The *984 usage of the word “status” is clear once we leave the abstraction of dictionaries and look at how the word is used in actual writing.
In fact, the Supreme Court has even told us that when the word “employee” “lacks any temporal qualifier” it can include people other than current employees. Robinson v. Shell Oil Co., 519 U.S. 337, 342, 117 S.Ct. 843, 846-847, 136 L.Ed.2d 808 (1997). Justice Thomas’s unanimous opinion explained that parts of Title VII “use the term ‘employees’ to mean something other than current employees,” including at least one place where the term “most naturally is read to mean ‘prospective employees.’ ” 519 U.S. at 343 n.3, 117 S.Ct. at 847 n.3. Robinson underscores how radical the majority’s reading of § 4(a)(2) is. If “employees” can mean prospective employees, surely “any individual” can too. But the majority says “any individual” unambiguously means “current employees” only. That can’t be right.
The text of the ADEA makes plain that “any individual” who is “deprive[d] ... of employment opportunities” because of his age can a file a disparate impact claim. The majority never explains why Congress chose the term “any individual” in § 4(a)(2) if it really meant “employee.” I say “any individual” méans “any individual.” The plain text of § 4(a)(2) resolves this case in Mr. Villarreal’s favor. And this reading is only further confirmed by: (1) other parts of the ADEA; (2) the Griggs case; (3) the Smith case; and (4) deference to the EEOC. I will discuss each in turn.
A.
The phrasing of the rest of § 4(a) confirms that “any individual” in § 4(a)(2) means “any individual.” For example, no one disputes that “any individual” in § 4(a)(1) refers to job applicants. And “a word or phrase is presumed to bear the same meaning throughout a text.” Scalia & Garner, supra at 170. In fact, whenever Congress meant anything other than “any individual” in § 4(a), it said so. Section 4(a) has three subsections, and only one does not use the term “any individual.” That is § 4(a)(3), which prohibits “reducing] the wage rate of any employee.” 29 U.S.C. § 623(a)(3) (emphasis added). Since employees earn wages and non-employees do not, no one disputes that § 4(a)(3) applies solely to employees. Thus, Congress’s choice of “any employee” rather than “any individual” in § 4(a)(3) makes sense.
In fact, § 4(a)(3) is a great tool for showing why the majority’s imposition of extra-textual meaning onto § 4(a)(2) is so wrong. The majority says Congress expected courts to divine from other parts of the statute that “any individual” in § 4(a)(2) actually means “any employee.” If that’s time, Congress should have said “any individual” in § 4(a)(3) too. That is because everyone could divine from “wage rate” that “any individual” implicitly meant “any employee.” Indeed, for § 4(a)(3) that assumption would be safer than for § 4(a)(2), since by definition, nobody other than employees can have their wage rates reduced. Yet Congress still said “any employee” rather than leaving this meaning to inference. Every time Congress meant “any employee” it said “any employee.” And every time it meant “any individual” it said “any individual.” In § 4(a)(2) it said “any individual.”'
The majority compares § 4(a)(2) to other parts of the ADEA too, but both those arguments end up confirming why “any individual” in § 4(a)(2) really means “any individual.” First, the majority asserts that “[ujnlike section 4(a)(1), section 4(a)(2) does not mention an employer refusing to hire someone.” Maj. Op. at 967. According to the majority, this means § 4(a)(2) can’t possibly apply to hiring claims. The major *985 ity accurately reports that § 4(a)(1) includes the phrase “refuse to hire” and § 4(a)(2) does not. But § 4(a)(1) also says “to discharge” and then § 4(a)(2) does not. Applying the majority’s same logic therefore, we would have to say that § 4(a)(2) doesn’t protect an employee from getting fired because of his age. When asked about this at oral argument, RJ Reynolds responded that § 4(a)(2) does impose liability on an employer who fires someone, for being old, but that liability comes from the later “adversely affect his status as an employee” language in § 4(a)(2). But if firing claims come from that later language despite the earlier “to limit, segregate, or classify” language (which says nothing about firing), then surely failure-to-hire claims can come from the later “deprive any individual of employment opportunities” language. As we know, that same language in Title VII allows failure-to-hire claims. It .must certainly do the same in the ADEA,
Second, the majority points to § 4(c)(2), which uses the words “status as an employee or as an applicant for employment” rather than “status as an employee” like § 4(a)(2). Maj. Op. at 966-67. The majority says this means § 4(a)(2) can’t protect people who weren’t hired for a job because of their age. The problem with the majority’s reliance on § 4(c)(2) is that this subsection governs labor organizations, not employers. Specifically, it governs a labor organization’s ability to “refuse to refer for employment.” 29 U.S.C. § 628(c)(2) (emphasis added). This part of the statute targets the unique way in which labor organizations can discriminate when they “refer” “applicants” to employers, such as through union hiring halls.[3] None of the other parts of the ADEA that govern employers say anything about “referring” anyone for employment, • Employers, after all, don’t “refer applicants.” But labor organizations, by virtue of their unique referral role, are sometimes the sole conduit by which an employer can get potential job applicants.[4] And § 4(c)(2) prohibits labor organizations from “refusing] to refer” a person for employment at all because of her age and thereby denying her “status .., as an applicant for employment.” In other words, the statute protects someone who sought work but was denied status as an applicant—that is, being allowed to apply at all—due to labor organizations’ control of the hiring process. It’s sometimes dangerous to infer what Congress meant in one part of a statute based, on what it didn’t say in other parts, at least without close analysis.[5]
*986 B.
I read the ADEA in the same way the Supreme Court read identical Title VII language in the seminal Griggs opinion. Griggs held that this identical language in Title VII authorizes disparate impact claims. When Smith read disparate impact liability into the ADEA, the Court “beg[a]n with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.” 544 U.S. at 233, 125 S.Ct. at 1541. The majority says Griggs is irrelevant because the plaintiffs in- that case were current employees, not job applicants. Maj. Op. at 968-69. But the employment requirements challenged in Griggs were used both for initial hiring as well as for those already employed, but who were seeking to transfer to other positions within the company. See 401 U.S. at 427-28, 91 S.Ct. at 852. And the first sentence of the Supreme Court’s unanimous opinion declared that the Court was deciding “whether an employer is prohibited ... from requiring a high school education or passing of a standardized general intelligence test as a condition of employment.” 401 U.S. at 425-26, 91 S.Ct. at 851 (emphasis added). The Court broadly held that Title VII forbids employment selection practices that are “fair in form but discriminatory in operation,” and it did not distinguish between the hiring employees and allowing them to transfer within the company. See kh at 431, 91 S.Ct. at 853.
The Supreme Court has never limited Griggs as the majority suggests. To the contrary, the Supreme Court has characterized Griggs as protecting job applicants.[6] See Connecticut v. Teal, 457 U.S. *987 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982) (noting that the challenged employment requirements in Griggs “applied equally to white and black employees and applicants, [but] barred employment opportunities to a disproportionate number of blacks”); id. at 458 n.2,102 S.Ct. at 2536 n.2 (Powell, J., joined by Rehnquist, C.J., and O’Connor, J., dissenting) (noting that the tests in Griggs “were an absolute bar to transfers or hiring”). Indeed, the Supreme Court’s most recent disparate impact case says Griggs governed “hiring criteria.” Inclusive Cmtys. Project, 135 S.Ct. at 2517. This makes sense, because Griggs itself was broadly concerned with protecting the interests of minority groups, both in securing and improving employment opportunities; See 401 U.S. at 430-31, 91 S.Ct. at 853 (“[T]he Act does not command that any person be hired simply because ... he is a member of a minority group.... What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate.”); id. at 431, 91 S.Ct. at 853 (“[T]ests or criteria for employment or promotion may not provide equality of opportunity merely in the sense of the fabled offer of milk to the stork and the fox. On the contrary, Congress has now required that the posture and condition of the job-seeker be taken into account.”).
The majority’s reading of Griggs ignores its reasoning. Griggs explained that disparate impact liability ensures that employers can’t use subtle forms of discrimination that “ ‘freeze’ the status quo,” create “artificial, arbitrary, and unnecessary barriers to employment,” or “operate as ‘built-in-headwinds’ for minority groups.” 401 U.S. at 430-32, 91 S.Ct. at 853-54. But under the majority’s reading of Griggs, Duke Power, the employer, was welcome to “ ‘freeze’ the status quo” and create all the “artificial, arbitrary, and unnecessary barriers to employment” it wanted by not hiring minorities at all. We know this is wrong. After deciding Griggs, the Supreme Court sent the case back to the District Court, which enjoined the use of discriminatory tests “as a condition of consideration for employment or promotion or transfer.” Griggs v. Duke Power Co., No. 210-G-66, 1972 WL 215, at *1 (M.D.N.C. Sept. 25, 1972).
C.
The next reason I would allow Mr. Villarreal’s claim to proceed is Smith v. City of Jackson, the Supreme Court’s most recent opinion that interprets § 4(a)(2). As I mentioned at the beginning, Smith held that § 4(a)(2) allows disparate impact claims. Four Justices reached this result based on the plain text, though they also cited an EEOC regulation as evidence that “the agency charged by Congress with responsibility for implementing the statute, 29 U.S.C. § 628, ha[s] consistently interpreted” § 4(a)(2) in the same way. Smith, 544 U.S. at 239, 125 S.Ct. at 1544 (plurality opinion). The plurality recognized that the regulation it was citing never “mentioned] disparate impact by name” and never purported to interpret § 4(a)(2). Id.[7] But the plurality nonetheless said this regulation “set[ ] forth the standards for a disparate-impact claim.” Id. at 240,125 S.Ct. at 1544. Justice Scalia (who added the fifth vote) went further, declaring that the EEOC’s regulation made Smith “an absolutely elas- *988 sic case for deference to agency interpretation” Id.- at 243, 125 S.Ct. at 1546 (Scalia, J., concurring in part),
“When comparing § 4(a)(1) and § 4(a)(2), the Smith plurality pointed to distinctions between employer motives and discriminatory effects as the “key textual differences” between those subsections. Id. at 236 n.6, 125 S.Ct. at 1542 n.6. In doing so, the plurality said nothing about the distinction between hiring versus other claims that the majority’s entire effort to distin-gúish Smith is staked on.[8] The plurality even cited two ADEA cases brought by job applicants in support of its statement that “for over two decades after our decision in Griggs, the Courts of Appeals uniformly interpreted the ADEA as authorizing recovery on a ‘disparate-impact’ theory in appropriate cases.” Id. at 236-37 & n.8, 125 S.Ct. at 1542-43 & n.8 (citing Wooden v. Bd. of Educ. of Jefferson Cty., 931 F.2d 376 (6th Cir. 1991), and Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419 (10th Cir. 1993)). If those were “appropriate” disparate impact cases, so is Mr. Villarreal’s.
D.
Eleven judges interpret § 4(a)(2) in today’s ruling. Among the eleven of us, we read the statute to mean at least three different things. While each of us feels certain about the correctness of our own reading, we can’t all be absolutely right. And where a statute can be variously interpreted (or in the vernacular, is “ambiguous”), courts must defer to the interpretation given by the agency charged with enforcing the statute. This is one more reason § 4(a)(2) must be read to protect job applicants. It is because the EEOC has always read the ADEA to protect them. And “it is axiomatic that the EEOC’s interpretation of [the ADEA], for which it has primary enforcement responsibility, need ... only be reasonable to be entitled to deference.” EEOC v. Comm. Office Prods. Co., 486 U.S. 107, 115, 108 S.Ct. 1666, 1671, 100 L.Ed.2d 96 (1988).[9]
*989 The EEOC’s ADEA disparate impact rule, which was issued through notice-and-comment rulemaking, confirms that § 4(a)(2). protects applicants. See 29 C.F.R. § 1625.7(c). And a preamble section titled “Benefits of the Rule” uses the EEOC’s data on hiring discrimination to explain how the rule addresses “neutral practices that act as barriers to the employment of older workers”:
Data show that older individuals who become unemployed have more difficulty finding a new position and tend to stay unemployed longer than younger individuals. To the extent that the difficulty in finding new work is attributable to neutral practices that act as barriers to the employment of older workers, the regulation should help to reduce the rate of their unemployment.
77 Fed. Reg. 19080, 19092 (2012) (footnote omitted). This satisfies “the basic procedural requirement[ ] of administrative rulemaking [] that an agency must give adequate reasons for its decisions.” Encino Motorcars, LLC v. Navarro, — U.S. -, -, 136 S.Ct. 2117, 2127, 195 L.Ed.2d 382 (2016); see also id. (“The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.” (quotation omitted)).
The EEOC has always held this same view. The EEOC first said so through notice-and-comment rulemaking in 1981. See 29 C.F.R. § 1625.7(d) (1981). That “regulation affirmed ... the longstanding position of the Department of Labor, the agency that previously administered the ADEA.” Smith, 544 U.S. at 244, 125 S.Ct. at 1547 (Scalia, J., concurring in part). Indeed, as early as 1968, months after the ADEA was signed into law, the Department of Labor (“which initially drafted the legislation,” id. at 239, 125 S.Ct. at 1544 (plurality opinion)) declared that supposedly neutral “pre-employment” tests must be “reasonably necessary for the specific work to be performed” and “equally applied to all applicants.” 33 Fed. Reg. 9173 (1968) (emphasis added); Smith, 544 U.S. at 239, 125 S.Ct. at 1544 (plurality opinion) (citing these “initial regulations” as evidence of the agency’s longstanding view). And the EEOC explained the interpretative basis for that rule to the Supreme Court over two decades ago.[10] But the majority adopts the view that the governing agency responsible for protecting against age discrimination has read the statute wrong for nearly half a century.
*990 [[Image here]]
The majority opinion never explains why Congress chose the words “deprive any individual of employment opportunities” for § 4(a)(2). Surely Congress chose those words because it meant “deprive any individual of employment opportunities” not “deprive [employees] of employment opportunities.” The agency charged with enforcing the ADEA agrees. That should be the end of that.
II.
The majority’s second holding may be even more harmful than its first. Mr. Villarreal says he “had no knowledge and no reason or means to know” about RJ Reynolds’s secret elimination of older workers from the hiring pool until just before he filed his EEOC charge. The majority holds that Mr. Villarreal’s equitable tolling claim cannot even survive a motion to dismiss because he did not try to uncover the secret policy earlier. Part of why this holding is so troubling is that it applies beyond the ADEA and beyond disparate impact claims. For example, suppose an employer intentionally screens out all black job applicants. No applicant would suspect that such odious discrimination was the reason he didn’t get a job, especially if he filled out a standard online application (like Mr. Villarreal did) or applied for dozens or hundreds of jobs (like many job seekers do). No reasonable applicant would assume that all those employers acted unlawfully or accuse all of them of discrimination.
Even when a job-seeker has a nagging suspicion that he has been passed over because of his age, it generally takes more than just suspicion to accuse an employer of something so wrong. And on the rare occasion when a job applicant dares to bring up the subject, all employers are not likely to confess to illegal conduct. Some might. But Mr. Villarreal’s case comes to us on a motion to dismiss, which means we are setting the baseline for every one of these cases. Our precedent until now has recognized that, “[s]ecret preferences in hiring and even more subtle means of illegal discrimination, because of their very nature, are unlikely to be readily apparent to the individual discriminated against.” Reeb, 516 F.2d at 931. Recognizing the difficulty in uncovering this type of discrimination, our precedent protects against, for example, an employer who screens out every black applicant and keeps this misconduct secret until the statute of limitations period has run. Under the majority’s new rule, even if an insider came forward later to exposes this bad conduct, the victim could not benefit from the extraordinary revelation. This change upsets over forty years of Fifth and Eleventh Circuit precedent.
A.
The diligence required for equitable tolling is reasonable diligence. And it isn’t reasonable for every single job applicant to assume she was discriminated against. The Supreme Court’s equitable tolling cases confirm this. The last time the Supreme Court confirmed that Title VII’s limitations period “is subject to equitable doctrines such as tolling,” the Court’s unanimous opinion listed various “circumstances where it will be difficult to determine when the time period should begin to run.” Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108, 114 n. 7, 122 S.Ct. 2061, 2073 n.7, 153 L.Ed.2d 106 (2002). For example, Justice Thomas wrote, “[o]ne issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered.” Id. But the Court concluded that the victim in that case “believed that he was being discriminated against at the time that all [the *991 discriminatory] acts occurred.” Id. (quotation omitted). For that reason, the Court ruled that the limitations period was not tolled.
The equitable tolling cases the Supreme Court decided before Morgan also touched on this idea of notice. See Irwin v. Dep’t of Veterans Affairs, 498 U.S. 89, 96, 111 S.Ct. 463, 458, 112 L.Ed.2d 435 (1990) (denying equitable tolling for a'plaintiff who waited too long to sue after alleging the same discrimination in an EEOC charge); Baldwin Cty, Welcome Ctr. v. Brown, 466 U.S. 147, 151, 104 S.Ct. 1723, 1725, 80 L.Ed.2d 196 (1984) (“This is not a case in which a claimant has received inadequate notice”). It is true that some equitable tolling cases don’t analyze notice in the same way, at least not expressly. But those cases all address overt government deprivations, such as a denied social security claim, a breach of contract by the government, or a ruling on a criminal conviction. In this type of case, notice can be assumed. For' example, a habeas petitioner can be assumed to have known about the ruling she is challenging from the moment the ruling issued. Indeed the only way she wouldn’t know is through something extraordinary, like deception or lawyer misconduct or abandonment. The same isn’t true for “[s]ecret preferences in hiring.” Reeb, 516 F.2d at 931. In these cases, “subtle means of illegal discrimination, because of their very nature, are unlikely to be readily apparent to the individual discriminated against.” Id. (emphasis added). That’s why our court has always equitably tolled the limitations period for these claims “until the facts which would support a cause of action are apparent or should be apparent.” Id. at 930.
The majority says Reeb is not relevant here because “that decision involved active deception by the employer.” Maj. Op. at 972. But our court has always said “equitable tolling does not require employer misconduct.” Cocke v. Merrill Lynch & Co., 817 F.2d 1559, 1561 (11th Cir. 1987). Also, Reeb did not turn on the employer’s deception. To the contrary, Judge Wisdom wrote that discriminatory hiring preferences tend to stay hidden “because of their very nature.” 516 F.2d at 931. Beyond that, any question about whether Reeb requires deception was resolved in Tucker v. UPS, 657 F.2d 724 (5th Cir.1981). The Tucker plaintiffs filed an EEOC charge more than 180 days after they were fired but less than 180 days after they learned that this firing might have been discriminatory. The plaintiffs weren’t misled, but the court allowed equitable tolling based on Reeb. Chief Judge Godbold made the same point I make today:
The ‘prudent person’ requirement of Reeb is not triggered by a . seasonal black employee’s being notified of an otherwise unexceptional decision that he is not going to be recalled. It would be anomalous indeed if persons protected by the statute from racial discrimination are required to presume that they are being discriminated against.
Id. at 726. The same is true for Mr. Villarreal. He was not “required to presume” discrimination from the “otherwise unexceptional” fact that he didn’t get a job offer. Id.
Other courts have come to adopt the Reeb test too. Indeed, this court once called Reeb’s notice requirement “a pronouncement that would be echoed by various circuits across the country.” Jones v. Dillard’s, Inc., 331 F.3d 1259, 1264 (11th Cir. 2003). Now the majority characterizes that the Second, Seventh, and D.C. Circuits courts as using a “general test” and says Mr. Villarreal has asked for a “special test.” Maj. Op. at 971. These vague labels do more to confuse than clarify. The fact is that all three of the courts the majority *992 references cited Reeb to hold that a plaintiffs lack of notice about employment discrimination is an “extraordinary circumstance” that warrants equitable. tolling.[11] So have at least three others.[12] No court has ever criticized the Reeb test. It is the test I would apply here.
B.
Under the majority's new rule, no discrimination victim can get equitable tolling unless he assumes he was discriminated against, no matter how unreasonable that assumption might be. I believe “this standard is too rigid.” Holland v. Florida, 560 U.S. 631, 634, 130 S.Ct. 2549, 2254, 177 L.Ed.2d 130 (2010). When Holland overruled our court’s equitable tolling standard, the Supreme Court instructed that
the “exercise of a court’s equity powers must be made on a case-by-case basis.”— The “flexibility” inherent in “equitable procedure” enables courts “to meet new situations that demand equitable intervention, and to accord all the relief necessary to correct particular injustices.” ,.. Such courts exercise judgment .,. with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case.
Id. at 649-50, 130 S.Ct. at 2563 (citations omitted) (alterations adopted). After Holland, we finally recognized that “[ejquita-ble tolling is, well, equitable in nature, and decisions regarding it must be made ‘on a case-by-case basis’ in light of ‘specific circumstances, often hard to predict in advance.’” Hutchinson v. Florida, 677 F.3d 1097, 1098 (11th Cir. 2012) (quoting Holland, 130. S.Ct. at 2563). The majority ignores that lesson here.
Worse, the majority’s rigid test makes little sense. The majority says Mr. Villarreal’s case needed to be dismissed because he didn’t “investigate the status of his application.” Maj. Op. at 972. The majority never explains why this distinction matters. Even if Mr. Villarreal learned that his application had been rejected, that would reveal nothing about whether the rejection was discriminatory.. Neither would an inquiry from Mr. Villarreal about the status of his application have made any difference to RJ Reynolds. Job applicants follow up on their applications all the time. That routine occurrence does not give notice to the employer that a discrimination charge is coming. Mr. Villarreal’s complaint said he filed an EEOC charge as soon as he learned that RJ Reynolds used *993 illegal hiring criteria to reject his application. And he claims he could not have learned about that secret conduct earlier. This is enough, in my view, to survive a motion to dismiss his case on the pleadings.
I don’t dispute that equitable tolling requires plaintiffs to act diligently. But the requirement has always been reasonable diligence. I see no basis to conclude that Mr. Villarreal acted unreasonably here. In fact, RJ Reynolds and its amici expressly ask us to speculate about facts that are not in the record. RJ Reynolds says Mr. Villarreal’s actions were unreasonable because he “did not even try to inquire about his application. If he had, RJ Reynolds would have told him that it was seeking entry-level salesmen with less experience.” And the Chamber of Commerce adds that Mr. Villarreal could have looked up whether the people RJ Reynolds hired created profiles on the social networking website Linkedln and then researched the ages of those people somewhere else. But this appeal comes to us on a motion to dismiss. That means we can’t assume anything about what RJ Reynolds “would have” said. And we certainly can’t know if using Linkedln to build a cause of action would have been either reasonably prudent or at all fruitful. One thing we can know however. is that “subtle means of illegal discrimination, because of their very nature, are unlikely to be readily apparent.” Reeb, 516 F.2d at 931.
Employers who act illegally should not escape liability just because their conduct was hidden through the end of the limitations period. In cases where illegal conduct is exposed after the limitations period, I would allow discovery on the question our court has always asked in these cases: when did the “facts which would support a cause of action [become] apparent ... to a person with a reasonably prudent regard for his rights”? Id. at 930. If discovery is limited to that question, the burden on defendants will be minimal. On that note, it’s worth remembering that equitable doctrines arise out of concern for the circumstances of both sides of a case. If RJ Reynolds showed that Mr. Villarreal’s delay was prejudicial in some way (such as due to lost evidence), a court would have to take that into account. But that never happened here. Instead, the majority says delay is always unacceptable, even if a victim had zero reason to act earlier. The Supreme Court held six years ago that this court’s equitable tolling “standard is too rigid.” Holland, 560 U.S. at 634, 130 S.Ct. at 2554. The majority’s new rule returns us down that path.

. The Dictionary Act was enacted in 1871 and must "be treated as if incorporated in and as a part of subsequent enactments.” Great N. Ry. Co. v. United States, 208 U.S. 452, 465, 28 S.Ct. 313, 316, 52 L.Ed. 567 (1908).

. I could go on. Someone trying to bring a class action can be "denied his status as class representative.” Duncan v. Tennessee, 84 F.R.D. 21, 32 (M.D. Tenn. 1979). Someone trying to file a claim in bankruptcy court could be “denied priority status.” Howard Delivery Serv., Inc, v. Zurich Am. Ins, Co., 547 U.S. 651, 656, 126 S.Ct. 2105, 2109, 165 L.Ed.2d 110 (2006). Someone trying to'work at sea can "be denied seaman status.” Chandris, Inc. v. Latsis, 515 U.S. 347, 372, 115 S.Ct. 2172, 2191, 132 L.Ed.2d 314 (1995). Someone trying to do seasonal work could be "denied SAW [special agricultural worker] status.” McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 496, 111 S.Ct. 888, 898, 112 L.Ed.2d 1005 (1991). Someone drafted into war could "be denied CO [conscientious objector] status.” Clark v. Gabriel, 393 U.S. 256, 264, 89 S.Ct. 424, 429, 21 L.Ed.2d 418 (1968). Cases like Santos show how the word “status” was used when Congress wrote the ADEA in 1967.

. For historical background on discriminatory union hiring halls, see Irving Kovarsky, Current Remedies for the Discriminatory Effects of Seniority Agreements, 24 Vand. L. Rev. 683, 694 n.47 (1971); Cornelius J. Peck, Remedies for Racial Discrimination in Employment, 46 Wash, L. Rev. 455, 470 (1971); Ralph K. Winter, Jr., Improving the Economic Status of Negroes Through Laws Against Discrimination, 34 U. Chi. L. Rev. 817, 824 (1967).

. See, e.g., Hiring Halls, Nat'l Labor Relations Bd., https://www.nlrb.gov/rights-we-protect/whats-law/employees/i-am-represented-union/hiring-halls (last visited Sept. 6, 2016) ("In some industries, most jobs are filled through referrals from.union hiring halls. Employers in the construction and maritime industries often choose to hire exclusively through referrals from union hiring halls.”); Leslie W. Bailey, Jr., Collective Union Hiring Halls; Service Under a Collective Bargaining Agreement as a Prerequisite to High Priority Referral, 19 Wm. & Mary L. Rev. 203, 203 (1977) ("Frequently, a person cannot apply for work at the job site or otherwise deal directly with the contractor because an exclusive hiring arrangement exists between the contractor and a union.”),

.Along these lines, it's also dangerous to infer what Congress meant in a statute based on what it didn’t say at all. Judge Rosenbaum’s concurrence details the history of the ADEA, which tracks the language of Title VII. She *986 focuses particularly on the fact that Congress never amended the ADEA to add the phrase "or applicants for employment” to § 4(a)(2). But we cannot know what Congress meant by not amending the ADEA. Perhaps Judge Rosenbaum’s theory on Congressional intent is correct, but it’s equally possible that Congress did not act because it thought the statute already encompassed job applicants. That is why the Supreme Court has warned us as a general rule not to give weight to legislative inaction when interpreting statutes. For example, in Crosby v. National Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), the Court refused to conclude that Congress "repeatedly declining] to enact express preemption provisions” implied anything “simply because the silence of Congress is ambiguous.” Id. at 386-88, 120 S.Ct. at 2301-02. Although Judge Rosenbaum notes that Crosby was about preemption and not the ADEA, my point remains unchanged: we simply should not consider legislative inaction when interpreting statutes.

. Our Court has also characterized Griggs in this way. See EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1279 n.16 (11th Cir. 2000) (“In Griggs ... the plaintiffs showed that the objective and facially neutral requirements ... in order to be hired or transferred ... had a disproportionate effect on white and black applicants.”); ick at 1282 n.18 (reading Griggs to apply to "neutral hiring and promotion practices”); Watkins v. Scott Paper Co., 530 F.2d 1159, 1179 (5th Cir. 1976) ("In Griggs, the Supreme Court held that a high school diploma requirement for hiring and transfer was not justified by business necessity.”); United States v. Ga. Power Co., 474 F.2d 906, 911 (5th Cir. 1973) ("In Griggs ... the Supreme Court held that the proviso of this section means that no test used for hiring or promotion is valid if it 'operates to exclude [African Americans] [and] cannot be shown to be related to job performance.' ” (second alteration in original)).
So have other courts. See El v. Se. Pa. Transp, Auth. (SEPTA), 479 F.3d 232, 239 (3d Cir. 2007) (“Griggs ... dealt with aptitude tests administered by an employer in making hiring decisions.”); Harper v. Trans World Airlines, Inc„ 525 F.2d 409, 411-12 (8th Cir. 1975) ("In Griggs, the Court struck down an employer’s use of certain aptitude tests when they were shown ... to have engendered discriminatory treatment concerning the hiring and transfer of blacks.”).

. Indeed that regulation simply said: "When an employment practice, including a test, is claimed as a basis for different treatment of employees or applicants for employment on the grounds that it is a 'factor other than’ age, and such a practice has an adverse impact on individuals within the protected age group, it can only be justified as a business necessity.” 29 C.F.R. § 1625.7(d) (2004).

. Judge Rosenbaum’s concurrence points out that the Smith plurality recognized that the difference in the text of the ADEA and Title VII could warrant treating disparate impact claims under the two statutes, differently. This is true. But the plurality was specifically talking about § 4(f)(1) of the ADEA, which contains language that significantly narrows its coverage by permitting “otherwise prohibited” action “where the differentiation is based on reasonable factors other than age.” 29 U.S.C. § 623(f)(1). Title VII includes no such language. For that reason, I don’t think you . can travel too far on Smith's observation that "the scope of disparate-impact liability under ADEA is narrower than under Title VII.” Id. at 240, 125 S.Ct. at 1544. And because I understand Judge Rosenbaum and I to agree that Smith .did not explicitly address whether § 4(a)(2) provides for a disparate-impact claim in the context of hiring decisions, this observation does not resolve the question before us.

. Related to this point, RJ Reynolds and its amici list various policy arguments in support of their view. The majority did right by choosing not to indulge these arguments. Policy choices belong to Congress and to agencies, not courts. See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 2699, 162 L.Ed.2d 820 (2005). Still, because some of these arguments might reappear in later litigation, I point out that they seem quite specious. RJ Reynolds and its amici first warn that disparate impact liability for hiring criteria will end efforts to recruit recent graduates. But the statute prohibits “limit[ing]” employees, and recruitment does nothing to "limit” anyone. Instead it expands who will apply for a job. Also, among the recruitment programs that RJ Reynolds’s amici claims are under threat are initiatives to target minority graduates. If those programs violate the ADEA, then they would have had to violate Title VII too. But they don’t.
RJ Reynolds’s amici next argue that age discrimination doesn’t require disparate impact, since all older workers were once young, so they didn’t face a lifetime (let alone generations) of prejudice as with race discrimination, The underlying point about race *989 discrimination is a good one. “[T]he persistence of racial inequality” requires effort “to counteract discrimination’s lingering effects. Those effects, reflective of a system of racial caste only recently ended, are evident in our workplaces.” Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 273, 115 S.Ct. 2097, 2135, 132 L.Ed.2d 158 (1995) (Ginsburg, X, dissenting) (citation omitted); see also Derrick Bell, Faces at the Bottom of the Well; The Permanence of Racism (1992). But this argument should be recognized for what it is; an attempt to re-litigate Smith. Smith says the ADEA imposes disparate impact liability for age discrimination. The question in Mr. Villarreal’s case is whether protection from the disparate impact of age discrimination extends to job applicants.

. See Petition for a Writ of Certiorari at 12-13, EEOC v. Francis W, Parker Sch., 515 U.S. 1142 (1995) (No. 941558, 1995 WL 17047545 ("The court of appeals ... reasoned that ... [§ 1 4(a)(2) protects only incumbent employees. That reasoning is seriously flawed. By its express terms, [§ ] 4(a)(2) is not limited to protecting incumbent employees. Although [§ ] 4(a)(2) makes it unlawful for an employer 'to limit, segregate, or classify his employees,' the employer may not engage in such conduct 'in any way which would deprive or tend to deprive any individual of employment opportunities.’ The use of the term 'individual' rather than ‘employee’ indicates that [§ ] 4(a)(2) protects applicants for employment.” (citation • omitted))..

. See Miller v. Int’l Tel Corp., 755 F.2d 20, 24 (2d Cir. 1985) ("An ‘extraordinary1 circumstance permitting tolling of the time bar on equitable grounds might exist if the employee could show that it would have been impossible for a reasonably prudent person to learn that his discharge was discriminatory.”); Vaught v. R.R. Donnelley & Sons Co., 745 F.2d 407, 410 (7th Cir. 1984) ("The tolling standard at issue here comes from the seminal case of Reeb[].”); Stoller v. Marsh, 682 F.2d 971, 974 (D.C. Cir. 1982) ("Under Title VII, if an employee did not at the time know or have reason to know that an employment decision was discriminatory in nature, the time limits for filing an administrative complaint may be tolled.”).

. See Allen v. Diebold, Inc., 33 F.3d 674, 676 (6th Cir. 1994). Though the Eighth and Ninth Circuits have never cited Reeb, they apply this same standard. See Dring v. McDonnell Douglas Corp., 58 F.3d 1323, 1329 (8th Cir. 1995) ("[W]hen a reasonable person in the plaintiffs situation would not be expected to know of the existence of a possible ADEA violation, this excusable ignorance may provide the basis for the proper invocation of the doctrine of equitable tolling.”); Boyd v. U.S. Postal Serv., 752 F.2d 410, 414 (9th Cir. 1985) ("The time period for filing a complaint of discrimination begins to run when the facts that would support a charge of discrimination would have been apparent to á similarly situated person with a reasonably prudent regard for his rights.”).