Scudder, Circuit Judge.
 

 After Dale Kleber unsuccessfully applied for a job at CareFusion Corporation, he sued for age discrimination on a theory of disparate impact liability. The district court dismissed his claim, concluding that § 4(a)(2) of the Age Discrimination in Employment Act did not authorize job applicants like Kleber to bring a disparate impact claim against a prospective employer. A divided panel of this court reversed. We granted
 
 en banc
 
 review and, affirming the district court, now hold that the plain language of § 4(a)(2) makes clear that Congress, while protecting employees from disparate impact age discrimination, did not extend that same protection to outside job applicants. While our conclusion is grounded in § 4(a)(2)'s plain language, it is reinforced by the ADEA's broader structure and history.
 

 I
 

 In March 2014, Kleber, an attorney, applied for a senior in-house position in CareFusion's law department. The job description required applicants to have "3 to 7 years (no more than 7 years) of relevant
 legal experience." Kleber was 58 at the time he applied and had more than seven years of pertinent experience. CareFusion passed over Kleber and instead hired a 29-year-old applicant who met but did not exceed the prescribed experience requirement.
 

 Kleber responded by bringing this action and pursuing claims for both disparate treatment and disparate impact under § 4(a)(1) and § 4(a)(2) of the ADEA. Relying on our prior decision in
 
 EEOC v. Francis W. Parker School
 
 ,
 
 41 F.3d 1073
 
 (7th Cir. 1994), the district court granted CareFusion's motion to dismiss Kleber's disparate impact claim, reasoning that the text of § 4(a)(2) did not extend to outside job applicants. Kleber then voluntarily dismissed his separate claim for disparate treatment liability under § 4(a)(1). This appeal followed.
 

 II
 

 A
 

 We begin with the plain language of § 4(a)(2). "If the statutory language is plain, we must enforce it according to its terms."
 
 King v. Burwell
 
 , --- U.S. ----,
 
 135 S.Ct. 2480
 
 , 2489,
 
 192 L.Ed.2d 483
 
 (2015). This precept reinforces the constitutional principle of separation of powers, for our role is to interpret the words Congress enacts into law without altering a statute's clear limits. See
 
 Puerto Rico v. Franklin Cal. Tax-Free Trust,
 
 --- U.S. ----,
 
 136 S.Ct. 1938
 
 , 1949,
 
 195 L.Ed.2d 298
 
 (2016).
 

 Section 4(a)(2) makes it unlawful for an employer
 

 to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.
 

 29 U.S.C. § 623
 
 (a)(2).
 

 By its terms, § 4(a)(2) proscribes certain conduct by employers and limits its protection to employees. The prohibited conduct entails an employer acting in any way to limit, segregate, or classify its employees based on age. The language of § 4(a)(2) then goes on to make clear that its proscriptions apply only if an employer's actions have a particular impact-"depriv[ing] or tend[ing] to deprive any individual of employment opportunities or otherwise adversely affect[ing] his status as an employee." This language plainly demonstrates that the requisite impact must befall an individual with "status as an employee." Put most simply, the reach of § 4(a)(2) does not extend to applicants for employment, as common dictionary definitions confirm that an applicant has no "status as an employee." See Merriam-Webster's Collegiate Dictionary 60, 408 (11th ed. 2003) (defining "applicant" as "one who applies," including, for example, "a job [applicant]," while defining "employee" as "one employed by another usu[ally] for wages or salary and in a position below the executive level").
 

 Subjecting the language of § 4(a)(2) to even closer scrutiny reinforces our conclusion. Congress did not prohibit just conduct that "would deprive or tend to deprive any individual of employment opportunities." It went further. Section 4(a)(2) employs a catchall formulation-"or otherwise adversely affect his status as an employee"-to extend the proscribed conduct. Congress's word choice is significant and has a unifying effect: the use of "or otherwise" serves to stitch the prohibitions and scope of § 4(a)(2) into a whole, first by making clear that the proscribed acts cover all conduct "otherwise affect[ing] his status as an employee,"
 

 and, second, by limiting the reach of the statutory protection to an individual with "status as an employee." See
 
 Villarreal v. R.J. Reynolds Tobacco Co.
 
 ,
 
 839 F.3d 958
 
 , 964 (11th Cir. 2016) (
 
 en banc
 
 ) (interpreting § 4(a)(2) the same way and explaining that the "or otherwise" language "operates as a catchall: the specific items that precede it are
 
 meant
 
 to be subsumed by what comes after the 'or otherwise' ").
 

 Kleber begs to differ, arguing that § 4(a)(2)'s coverage extends beyond employees to applicants for employment. He gets there by focusing on the language in the middle of § 4(a)(2)-"deprive or tend to deprive any individual of employment opportunities"-and contends that the use of the expansive term "any individual" shows that Congress wished to cover outside job applicants. If the only question were whether a job applicant counts as "any individual," Kleber would be right. But time and again the Supreme Court has instructed that statutory interpretation requires reading a text as a whole, and here that requires that we refrain from isolating two words when the language surrounding those two words supplies essential meaning and resolves the question before us. See,
 
 e.g.
 
 ,
 
 United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.
 
 ,
 
 484 U.S. 365
 
 , 371,
 
 108 S.Ct. 626
 
 ,
 
 98 L.Ed.2d 740
 
 (1988) (describing statutory construction as a "holistic endeavor"); see also
 
 K Mart Corp. v. Cartier, Inc.
 
 ,
 
 486 U.S. 281
 
 , 291,
 
 108 S.Ct. 1811
 
 ,
 
 100 L.Ed.2d 313
 
 (1988) (directing courts to consider "the language and design of the statute as a whole");
 
 Trustees of Chicago Truck Drivers v. Leaseway Transp. Corp.
 
 ,
 
 76 F.3d 824
 
 , 828 (7th Cir. 1996) (emphasizing the same points and explaining that the meaning of statutory text comes from reading language in context and not words in insolation).
 

 Reading § 4(a)(2) in its entirety shows that Congress employed the term "any individual" as a shorthand reference to someone with "status as an employee." This construction is clear from Congress's use of language telling us that the provision covers "any individual" deprived of an employment opportunity because such conduct "adversely affects his status as an employee." Put differently, ordinary principles of grammatical construction require connecting "any individual" (the antecedent) with the subsequent personal possessive pronoun "his," and upon doing so we naturally read "any individual" as referring and limited to someone with "status as an employee." See
 
 Flora v. United States
 
 ,
 
 362 U.S. 145
 
 , 150,
 
 80 S.Ct. 630
 
 ,
 
 4 L.Ed.2d 623
 
 (1960) ("This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments."). The clear takeaway is that a covered individual must be an employee.
 

 Our conclusion becomes ironclad the moment we look beyond § 4(a)(2) and ask whether other provisions of the ADEA distinguish between employees and applicants. See
 
 Mount Lemmon Fire Dist. v. Guido
 
 , --- U.S. ----,
 
 139 S.Ct. 22
 
 , 24,
 
 202 L.Ed.2d 262
 
 (2018) (endorsing this same approach when interpreting the ADEA's various definitions of "employer"). We do not have to look far to see that the answer is yes.
 

 Right next door to § 4(a)(2) is § 4(a)(1), the ADEA's disparate treatment provision. In § 4(a)(1), Congress made it unlawful for an employer "
 
 to fail or refuse to hire
 
 or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."
 

 29 U.S.C. § 623
 
 (a)(1) (emphasis added). All agree that § 4(a)(1), by its terms, covers both employees and applicants. See,
 
 e.g.
 
 ,
 
 Kralman v. Ill. Dep't of Veterans' Affairs
 
 ,
 
 23 F.3d 150
 
 , 152-53 (7th Cir. 1994) (treating an applicant's right to bring a claim under § 4(a)(1) as unquestioned). Compelling this consensus is § 4(a)(1)'s use of the words "to fail or refuse to hire or to discharge," which make clear that "any individual" includes someone seeking to be hired.
 
 29 U.S.C. § 623
 
 (a)(1).
 

 Yet a side-by-side comparison of § 4(a)(1) with § 4(a)(2) shows that the language in the former plainly covering applicants is conspicuously absent from the latter. Section 4(a)(2) says nothing about an employer's decision "to fail or refuse to hire ... any individual" and instead speaks only in terms of an employer's actions that "adversely affect his status as an employee." We cannot conclude this difference means nothing: "when 'Congress includes particular language in one section of a statute but omits it in another'-let alone in the very next provision-the Court presumes that Congress intended a difference in meaning."
 
 Loughrin v. United States
 
 ,
 
 573 U.S. 351
 
 , 358,
 
 134 S.Ct. 2384
 
 ,
 
 189 L.Ed.2d 411
 
 (2014) (quoting
 
 Russello v. United States
 
 ,
 
 464 U.S. 16
 
 , 23,
 
 104 S.Ct. 296
 
 ,
 
 78 L.Ed.2d 17
 
 (1983) ).
 

 There is even more. A short distance away from § 4(a)(2) is § 4(c)(2), which disallows labor organizations from engaging in particular conduct. Section 4(c)(2), in pertinent part, makes it unlawful for a labor organization
 

 to limit, segregate, or classify its membership ... in any way which would deprive or tend to deprive any individual of employment opportunities ... or otherwise adversely affect his status as an employee
 
 or as an applicant for employment
 
 , because of such individual's age.
 

 29 U.S.C. § 623
 
 (c)(2) (emphasis added).
 

 The parallel with § 4(a)(2) is striking: both provisions define the prohibited conduct in terms of action that "would deprive or tend to deprive any individual of employment opportunities," only then to include the "or otherwise adversely affect" catchall language. But there is a big difference between the two provisions: § 4(c)(2)'s protection extends to any individual with "status as an employee or
 
 as an applicant for employment
 
 ," whereas Congress limited § 4(a)(2)'s reach only to someone with "status as an employee."
 

 Consider yet another example. In § 4(d), Congress addressed employer retaliation by making it "unlawful for an employer to discriminate against any of his
 
 employees or applicants for employment"
 
 because such an individual has opposed certain unlawful practices of age discrimination.
 
 29 U.S.C. § 623
 
 (d) (emphasis added). Here, too, the distinction between "employees" and "applicants" jumps off the page.
 

 Each of these provisions distinguishes between employees and applicants. It is implausible that Congress intended no such distinction in § 4(a)(2), however, and instead used the term employees to cover both employees and applicants. To conclude otherwise runs afoul of the Supreme Court's admonition to take statutes as we find them by giving effect to differences in meaning evidenced by differences in language. See
 
 Mount Lemmon Fire Dist.
 
 ,
 
 139 S.Ct. at 26
 
 (declining the defendant's invitation to take language from one part of a sentence and then "reimpose it for the portion" of the sentence in which Congress omitted the same language); see also
 
 Dep't of Homeland Sec. v. MacLean
 
 , --- U.S. ----,
 
 135 S.Ct. 913
 
 , 919,
 
 190 L.Ed.2d 771
 
 (2015) (explaining that "Congress generally acts intentionally when it uses particular
 language in one section of a statute but omits it in another").
 

 In the end, the plain language of § 4(a)(2) leaves room for only one interpretation: Congress authorized only employees to bring disparate impact claims.
 

 B
 

 Kleber urges a different conclusion in no small part on the basis of the Supreme Court's 1971 decision in
 
 Griggs v. Duke Power Co.
 
 ,
 
 401 U.S. 424
 
 ,
 
 91 S.Ct. 849
 
 , where the Court interpreted § 703(a)(2) of Title VII and held that disparate impact was a viable theory of liability. Indeed, Kleber goes so far as to say
 
 Griggs
 
 -a case where the Court considered language in Title VII that at the time paralleled the language we consider here-controls and mandates a decision in his favor. We disagree.
 

 A commonsense observation is warranted at the outset. If Kleber is right that
 
 Griggs
 
 , a Title VII case, compels the conclusion that § 4(a)(2) of the ADEA authorizes outside job applicants to bring a disparate impact claim, we find it very difficult to explain why it took the Supreme Court 34 years to resolve whether anyone-employee or applicant-could sue on a disparate impact theory under the ADEA, as it did in
 
 Smith v. City of Jackson
 
 ,
 
 544 U.S. 228
 
 ,
 
 125 S.Ct. 1536
 
 ,
 
 161 L.Ed.2d 410
 
 (2005). There was no need for the Court to decide
 
 Smith
 
 if (all or part of) the answer came in
 
 Griggs
 
 . And when the Court did decide
 
 Smith
 
 the Justices' separate opinions recognized the imperative of showing impact to an individual's "status as an employee" when discerning the reach of § 4(a)(2). See
 
 id
 
 . at 235-36, 236 n.6,
 
 125 S.Ct. 1536
 
 (plurality opinion); see
 
 id
 
 . at 266,
 
 125 S.Ct. 1536
 
 (O'Connor, J., concurring, joined by Kennedy & Thomas, JJ.).
 

 Kleber's position fares no better within the four corners of
 
 Griggs
 
 itself. Several African-American employees of Duke Power challenged the company's practice of conditioning certain job transfers and promotions on graduating from high school and passing a standardized aptitude test. See
 
 401 U.S. at 426
 
 ,
 
 91 S.Ct. 849
 
 . The employees sued under § 703(a) of Title VII, a provision that in 1971 mirrored the present language of § 4(a)(2) of the ADEA. See
 
 id
 
 . at 426 n.1,
 
 91 S.Ct. 849
 
 . The Court held that § 703(a)(2) prohibits disparate impact discrimination by proscribing "practices that are fair in form, but discriminatory in operation" unless an employer can show that the challenged practice is "related to job performance" and thus a "business necessity."
 

 Id.
 

 at 431
 
 ,
 
 91 S.Ct. 849
 
 .
 

 Kleber would have us read
 
 Griggs
 
 beyond its facts by focusing on language in a couple of places in the Court's opinion that he sees as covering employees and applicants alike. We decline the invitation. Nowhere in
 
 Griggs
 
 did the Court state that its holding extended to job applicants. And that makes perfect sense because nothing about the case, brought as it was by employees of Duke Power and not outside applicants, required the Court to answer that question. The language that Kleber insists on reading in isolation must be read in context, and the totality of the
 
 Griggs
 
 opinion makes clear that the Court answered whether Duke Power's African-American employees could bring a claim for disparate impact liability based on practices that kept them from pursuing different, higher-paying jobs within the company.
 

 What happened a year after
 
 Griggs
 
 cements our conclusion. In 1972, Congress amended § 703(a)(2) of Title VII-the provision at issue in
 
 Griggs
 
 -by adding language to expressly include "applicants for employment."
 

 Pub. L. No. 92-261, § 8(a),
 
 86 Stat. 109
 
 (1972). This amendment occurred in the immediate wake of
 
 Griggs
 
 and, in this way, reflected Congress's swift and clear desire to extend Title VII's disparate impact protection to job applicants. There was no need for Congress to amend § 703(a)(2) if the provision had always covered job applicants and especially if the Supreme Court had just said so in
 
 Griggs
 
 . To conclude otherwise renders the 1972 amendment a meaningless act of the 92nd Congress, and we are reluctant to conclude that substantive changes to statutes reflect idle acts.
 

 The Supreme Court endorsed this precise course of analysis-giving effect to "Congress's decision to amend Title VII's relevant provisions but not make similar changes to the ADEA"-in
 
 Gross v. FBL Financial Servs., Inc.
 
 ,
 
 557 U.S. 167
 
 , 174,
 
 129 S.Ct. 2343
 
 ,
 
 174 L.Ed.2d 119
 
 (2009). The Court there considered whether a plaintiff suing under § 4(a)(1) of the ADEA must establish that age was the but-for cause of an employer's adverse action. See
 
 id
 
 . at 173,
 
 129 S.Ct. 2343
 
 . The plaintiff urged the Court to adopt Title VII's lesser standard of race being only a motivating factor in the challenged decision. See
 

 id.
 

 Paramount to the Court's conclusion that an ADEA plaintiff must prove but-for causation were textual differences between the ADEA and Title VII brought about by Congress's amendments to Title VII. See
 
 id
 
 . at 174,
 
 129 S.Ct. 2343
 
 (explaining that "Congress neglected to add such a [motivating-factor] provision to the ADEA when it amended Title VII [in 1991]" and emphasizing that "[w]hen Congress amends one statutory provision but not another, it is presumed to have acted intentionally"). The Court's instruction was clear: prior decisions interpreting Title VII "do not control our construction of the ADEA" where the text of the two statutes are "materially different."
 
 Id
 
 . at 173,
 
 129 S.Ct. 2343
 
 .
 

 And so it is here. Congress's choice to add "applicants" to § 703(a)(2) of Title VII but not to amend § 4(a)(2) of the ADEA in the same way is meaningful.
 
 Gross
 
 teaches that we cannot ignore such differences in language between the two enactments. And, at the risk of understatement,
 
 Gross
 
 is far from an aberration in statutory construction. A mountain of precedent supports giving effect to statutory amendments. See,
 
 e.g.
 
 ,
 
 United States v. Quality Stores, Inc.
 
 ,
 
 572 U.S. 141
 
 , 148,
 
 134 S.Ct. 1395
 
 ,
 
 188 L.Ed.2d 413
 
 (2014) (quoting
 
 Stone v. INS
 
 ,
 
 514 U.S. 386
 
 , 397,
 
 115 S.Ct. 1537
 
 ,
 
 131 L.Ed.2d 465
 
 (1995) ) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.");
 
 Fidelity Fin. Servs., Inc. v. Fink
 
 ,
 
 522 U.S. 211
 
 , 220-21,
 
 118 S.Ct. 651
 
 ,
 
 139 L.Ed.2d 571
 
 (1998) (explaining that after Congress modified the federal statute controlling when a transfer of a security interest was perfected, "we see no basis to say that subsequent amendments removing references to state-law options had the counterintuitive effect of deferring to such [state law] options" without unwinding the statutory amendments);
 
 United States v. Wells
 
 ,
 
 519 U.S. 482
 
 , 492-93,
 
 117 S.Ct. 921
 
 ,
 
 137 L.Ed.2d 107
 
 (1997) (explaining that after Congress amended the federal criminal statute pertinent to false representations to remove any express reference to materiality, "the most likely inference in these circumstances is that Congress deliberately dropped the term 'materiality' without intending materiality to be an element of [ 18 U.S.C.] § 1014");
 
 Stone
 
 ,
 
 514 U.S. at 397-98
 
 ,
 
 115 S.Ct. 1537
 
 (explaining that after Congress amended the Immigration and Naturalization Act, "[t]he reasonable construction [was] that the amendment was enacted as an exception, not just to state an already existing rule").
 

 In no way does this analysis downplay
 
 Griggs
 
 , as our dissenting colleagues contend. We have approached
 
 Griggs
 
 as binding precedent and construed its holding not only by reading what the Supreme Court's opinion says (and does not say), but also in light of Congress's immediately amending Title VII (but not § 4(a)(2) of the ADEA) to cover "applicants" as well as the broader development in the law ever since, including with precedents like
 
 Smith
 
 in 2005 and
 
 Gross
 
 in 2009.
 

 The upshot is clear: while Congress amended § 703(a)(2) of Title VII in 1972 to cover "applicants for employment," it has never followed suit and modified § 4(a)(2) of the ADEA in the same way. And this is so despite Congress's demonstrating, just a few years after
 
 Griggs,
 
 that it knew how to amend the ADEA to expressly include outside job applicants. See
 
 Villarreal
 
 ,
 
 839 F.3d at 979-80
 
 (Rosenbaum, J., concurring) (observing that Congress amended the ADEA in 1974 to extend the statute's reach to federal-government employment, and in doing so, explicitly referenced both "employees and applicants for employment" in the new provision, 29 U.S.C. § 633a ).
 

 Today, then, § 703(a)(2) of Title VII differs from § 4(a)(2) in at least one material respect: the protections of the former extend expressly to "applicants for employment," while the latter covers only individuals with "status as an employee." We underscored this exact difference 14 years ago in our opinion in
 
 Francis W. Parker
 
 , and we do so again today. See
 
 41 F.3d at 1077
 
 ("The 'mirror' provision in the ADEA omits from its coverage, 'applicants for employment.' "). The plain language of § 4(a)(2) controls and compels judgment in CareFusion's favor.
 

 C
 

 Beyond his reliance on
 
 Griggs
 
 , Kleber invites us to read the ADEA against the backdrop of Congress's clear purpose of broadly prohibiting age discrimination. On this score, he points us to the Supreme Court's decision in
 
 Robinson v. Shell Oil Company
 
 ,
 
 519 U.S. 337
 
 ,
 
 117 S.Ct. 843
 
 ,
 
 136 L.Ed.2d 808
 
 (1997) and to the report of the former Secretary of the Department of Labor, Willard Wirtz.
 

 In
 
 Robinson
 
 , the Court held that § 704(a) of Title VII extended not just to "employees" (a term used in § 704(a) ), but also to former employees. See
 
 id
 
 . at 346,
 
 117 S.Ct. 843
 
 . The Court emphasized that, while the meaning of "employees" was ambiguous, Title VII's broader structure made plain that Congress intended the term to cover former employees, a construction that furthered Title VII's broader purposes. None of this helps Kleber. (Indeed, if anything,
 
 Robinson
 
 's clear observation of the distinct and separate meaning of "employees" and "applicants for employment" in § 704(a) severely undermines Kleber's textual argument. See
 
 id
 
 . at 344,
 
 117 S.Ct. 843
 
 .)
 
 Robinson
 
 , in short, provides direction on how courts-if confronted with statutory ambiguity-should resolve such ambiguity. There being no ambiguity in the meaning of § 4(a)(2) of the ADEA, our role ends-an outcome on all fours with
 
 Robinson
 
 .
 

 The Wirtz Report reflected the Labor Department's response to Congress's request for recommended age discrimination legislation, and a plurality of the Supreme Court in
 
 Smith
 
 treated the Report as an authoritative signal of Congress's intent when enacting the ADEA. See
 
 Smith
 
 ,
 
 544 U.S. at 238
 
 ,
 
 125 S.Ct. 1536
 
 . We do too.
 

 Nobody disputes that the Wirtz Report reinforces Congress's clear aim of enacting the ADEA to prevent age discrimination in the workplace by encouraging the employment of older persons, including older job
 applicants. But we decline to resolve the question presented here on the basis of broad statutory purposes or, more specifically, to force an interpretation of but one provision of the ADEA (here, § 4(a)(2) ) to advance the enactment's full objectives.
 

 Our responsibility is to interpret § 4(a)(2) as it stands in the U.S. Code and to ask whether the provision covers outside job applicants. We cannot say it does and remain faithful to the provision's plain meaning. It remains the province of Congress to choose where to draw legislative lines and to mark those lines with language. Our holding gives effect to the plain limits embodied in the text of § 4(a)(2).
 

 The ADEA, moreover, is a wide-ranging statutory scheme, made up of many provisions beyond § 4(a)(2). And a broader look at the statute shows that outside job applicants have other provisions at their disposal to respond to age discrimination. Section 4(a)(1), for example, prevents an employer from disparately treating both job applicants and employees on the basis of age. See
 
 29 U.S.C. § 623
 
 (a)(1). Section 4(c)(2), prevents a labor organization's potential age discrimination against both job applicants and employees. See
 
 29 U.S.C. § 623
 
 (c)(2).
 

 Today's decision, while unfavorable to Kleber, leaves teeth in § 4(a)(2). The provision protects older employees who encounter age-based disparate impact discrimination in the workplace. And Congress, of course, remains free to do what the judiciary cannot-extend § 4(a)(2) to outside job applicants, as it did in amending Title VII.
 

 For these reasons, we AFFIRM.